**NORTH LAWNDALE ECONOMIC DEVELOPMENT CORPORATION, Petitioner,**

v.

**BOARD OF GOVERNORS OF the FEDERAL RESERVE SYSTEM, Respondent.**

No. 76–1607.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 4, 1977.

Decided March 31, 1977.

Rehearing Denied May 3, 1977.

ments to promote the community welfare and development of the Midwest Impact Area, an area characterized by high unemployment and substantial poverty on the west side of Chicago. These investments include an industrial park, a shopping mall, a thousand bed mixed-use health care facility, property management, a broadband telecommunications system and other investments in projects to construct and rehabilitate low and moderate income housing. It also wishes to acquire a bank being organized in Illinois, the Community Bank of Lawndale. The bank was to be acquired through purchase of 90% of its shares by petitioner for $1.8 million. This sum was to come from a $2 million grant of public funds pledged to petitioner for this purpose by the Community Services Administration under Title VII of the Community Services Act of 1974 (42 U.S.C. § 2981 *et seq.*). The Community Services Administration provides much of the capital contributions used to fund petitioner's investments.

On September 4, 1974, the Illinois Commissioner of Banks issued petitioner a permit to organize the Community Bank of Lawndale, subject to petitioner's obtaining prior approval of the Board of Governors of the Federal Reserve System to become a bank holding company before issuance of a charter. Accordingly, on January 13, 1975, petitioner filed applications with the Board seeking its approval to become a bank holding company and to engage in various non-banking activities. Specifically, petitioner applied for the Board's approval, under Section 3(a)(1) of the Bank Holding Company Act (12 U.S.C. § 1842(a)(1)), for the formation of a bank holding company through acquisition of 90% of the voting shares of the Community Bank of Lawndale, the proposed new bank. Simultaneously, petitioner applied for permission for the bank holding company to continue in various community development ventures in its economically depressed area on the ground that its activities are "so closely related to banking or managing or controlling banks as to be a proper incident thereto" under Section

Julian B. Wilkins, Maurice R. Glover, Earl L. Neal, Chicago, Ill., for petitioner.

Michael Kimmel, Atty., Civ. Div., Appellate Section, Dept. of Justice, Washington, D. C., for respondent.

Before FAIRCHILD, Chief Judge, CUMMINGS, Circuit Judge, and EAST, Senior District Judge.*

PER CURIAM.

Petitioner is a Delaware corporation authorized to do business in Illinois. It is engaged in the business of making invest-

---

* Senior District Judge William G. East of the District of Oregon is sitting by designation.

4(c)(8) of the Act (12 U.S.C. § 1843(c)(8)) and 12 C.F.R. § 225.4(b)(2), the procedural implementation provision of the Board's Regulation Y. Petitioner maintains that its

1. Section 225.4(a)(7) (12 C.F.R. § 225.4(a)(7)) provides, in pertinent part, as follows:

   "The following activities have been determined by the Board to be so closely related to banking or managing or controlling banks as to be a proper incident thereto:

   \*     \*     \*     \*     \*     \*

   "(7) Making equity and debt investments in corporations or projects designed primarily to promote community welfare, *such as* the economic rehabilitation and development of low-income areas."

2. The interpreting provision, Section 225.127 (12 C.F.R. § 225.127), provides:

   "Investment in corporations or projects *designed primarily to promote community welfare.*

   "(a) Under § 225.4(a)(7) of Regulation Y, a bank holding company may, in accordance with the provisions of § 225.4(b), engage in 'making equity and debt investments in corporations or projects designed primarily to promote community welfare, such as the economic rehabilitation and development of low-income areas.' The Board included that activity among those the Board has determined to be so closely related to banking or managing or controlling banks as [to] be a proper incident thereto, in order to permit bank holding companies to fulfill their civic responsibilities. *As indicated hereinafter in this interpretation, the Board intends* § 225.4(a)(7) *to enable bank holding companies to take an active role in the quest for solutions to the Nation's social problems.* Although the interpretation primarily focuses on low- and moderate-income housing, it is not intended to limit projects under § 225.4(a)(7) to that area. Other investments primarily designed to promote community welfare are considered permissible, but have not been defined in order to provide bank holding companies flexibility in approaching community problems. For example, bank holding companies may utilize this flexibility to provide new and creative approaches to the promotion of employment opportunities for low-income persons. Bank holding companies possess a unique combination of financial and managerial resources making them particularly suited for a meaningful and substantial role in remedying our social ills. Section 225.4(a)(7) is intended to provide an opportunity for them to assume such a role.

   "(b) Under the authority of § 225.4(a)(7), a bank holding company may invest in community development corporations established *pursuant to Federal or State law. A bank* holding company may also participate in oth-

activities are permissible for bank holding companies in accordance with Section 225.-4(a)(7) [1] of Regulation Y as interpreted by Section 225.127.[2]

er civic projects, such as a municipal parking facility sponsored by a local civic organization as a means to promote greater public use of the community's facilities.

   "(c) Within the category of permissible investments under § 225.4(a)(7) are investments in projects to construct or rehabilitate multi-family low- or moderate-income housing with respect to which a mortgage is insured *under sections 221(d)(3), 221(d)(4), or* 236 of the National Housing Act (12 U.S.C. 1701) and investments in projects to construct or rehabilitate low- or moderate-income housing which is financed or assisted by direct loan, tax abatement, or insurance under provisions of State or to that area. Other investments primarily designed to promote community welfare are considered permissible, but have not been defined in order to provide bank holding companies flexibility in approaching community problems. For example, bank holding companies may utilize this flexibility to provide new and creative approaches to the promotion of employment opportunities for low-income persons. *Bank holding companies possess a unique combination* of financial and managerial resources making them particularly suited for a meaningful and substantial role in remedying our social ills. Section 225.4(a)(7) is intended to provide an opportunity for them to assume such a role.

   "(d) Investments in other projects that may be considered to be designed primarily to promote community welfare include but are not limited to: (1) Projects for the construction or rehabilitation of housing for the benefit of persons of low- or moderate-income, (2) projects for the construction or rehabilitation of ancillary local commercial facilities necessary to provide goods or *services principally to persons residing in low- or* moderate-income housing, and (3) projects designed explicitly to create improved job opportunities for low- or moderate-income groups (for example, minority equity investments, on a temporary basis, in small or medium-sized locally-controlled businesses in low-income urban or other economically depressed areas). In the case of de. novo projects, the copy of the notice with respect to such other projects which is to be furnished to Reserve Banks in accordance with the provisions of § 225.4(b)(1) should be accompanied by a memorandum which demonstrates that such projects meet the objectives of § 225.4(a)(7).

   "(e) *Investments in corporations or projects organized to build or rehabilitate*

On July 25, 1975, the Federal Deposit Insurance Corporation told petitioner that the required deposit insurance had been approved for the proposed bank. On October 15, 1975, the Federal Reserve Bank of Chicago advised petitioner that the Reserve Bank had completed its processing of petitioner's revised applications and had forwarded them to the Board of Governors in Washington. Its recommendation regarding the approval of petitioner's application was sent to Washington on December 22, 1975. The Board asked the petitioner for additional information by letter of January 12, 1976, and the petitioner responded on January 23, 1976, referring the Board to those portions of the previously submitted materials where the requested information could be found. A notice dated January 16, 1976, was published in the Federal Register on January 26, 1976, requesting comments on the proposed holding company.[3] No adverse comments ensued. In particular, the Illinois Commissioner of Banks and Trust Companies advised the Board on January 28, 1976, that it had no objections.[4] By letter of January 30, 1976, to the Board, the Community Services Administration clarified its funding role, both present and future, with respect to the bank. On March 11, 1976, representatives of the petitioner met with various Board staff members in Washington, D. C., to seek immediate action on its applications. No written material was submitted by petitioner to the Board at that meeting. By order of June 7, 1976, the applications were denied by the Board. This appeal followed under 12 U.S.C. § 1848.

In pertinent part, Section 3(b) and Section 4(c) of the Bank Holding Company Act provide:

"In the event of the failure of the Board to act on any application for [an order under this section] within the ninety-one-day period which begins on the date of submission to the Board of the complete record on that application, the application shall be deemed to have been granted" (12 U.S.C. §§ 1842(b) and 1843(c)).

Petitioner asserts that both its applications must be deemed granted as a matter of law because the Board's order denying the applications was not made within ninety-one days from October 15, 1975, the date of submission to the Board of the complete record on the applications. Instead, the denial occurred 232 days after October 15, 1975.

We agree with petitioner that its applications must be deemed to have been granted because the Board did not act on them within ninety-one days after the complete record was submitted. We recently so ruled in *Tri-State Bancorporation v. Board of Governors of the Federal Reserve System*, 524 F.2d 562 (7th Cir. 1975). As we said there:

---

high-income housing, or commercial, office, or industrial facilities that are not designed explicitly to create improved job opportunities for low-income persons shall be presumed not to be designed primarily to promote community welfare, unless there is substantial evidence to the contrary, even though to some extent the investment may benefit the community."

**3.** The notice seems to have been published later than most notices for bank holding companies:
"Normally, notice of an application is published in the Federal Register within five to seven days following acceptance of the application by a Reserve Bank." Letter of Michael A. Greenspan, Assistant Secretary of the Federal Reserve Board to Donald L. Rogers, Executive Director, Association of Registered Bank Holding Companies, Nov. 14, 1972 (App. 149A–151). CCH Fed.Bank.L.

Rep. [1966–1973] Transfer Binder ¶ 95,820 (1972). See also, 12 C.F.R. § 262.3(g)(1).

**4.** Under Section 3(b) of the Bank Holding Company Act (12 U.S.C. § 1842(b)), the Board is to give notice to the appropriate state supervisory authority "upon receiving" an application. Although the application was forwarded to the Board on October 15, 1975, the view of the Illinois Commissioner was not sought until January 21, 1976. In a letter of February 18, 1976, the Board claimed it had not given the notice because "the application did not contain sufficient information," prompting the Board's January 12, 1976, request for additional information. But the Board released its notice to the general public on January 16, 1976, and sent notice to the Illinois Commission on January 21, 1976, prior to the petitioner's January 23, 1976, response to the Board's January 12, 1976 inquiry.

"The [91-day] limit was enacted in response to an apparent slow pace on the part of the Fed in ruling on applications. It would have no meaning if the Fed had the power to determine when the time had begun to run." *Id.* at 566.

As we noted, it is not impossible for the Board to meet the 91-day standard. *Id.* at 567.

■ To avoid the application of the 91-day limitation period, the Board contends that the record was not completed until the March 11, 1976, meeting between officers of the petitioner and the Board staff. In the Board's view, the 91-day clock was reset on March 11, 1976, making the new deadline June 9, 1976.[5] However, it was conceded by the Board at oral argument that there were only oral discussions concerning facts already in the record at the March 11 meeting, and this is borne out by the Board's memorandum of March 11 (Board Appendix 21a–22a). Oral argument marshalling facts already in the Board's possession is not itself part of the "complete record" under the 91-day limitation provisions. *Tri-State Bancorporation, Inc., supra,* 524 F.2d at 566. Moreover, at the January 4 oral argument

before us, the Board admitted that petitioner had advised Board personnel on March 11 that they were entering into the discussions on that date with the express understanding that the meeting would not toll the ninety-one day time limit.

■ We hold that to avoid the ninety-one day rule, the Board was obliged to act on the application by May 4, 1976, which was ninety-one days from the submission to the Board of the January 30, 1976, letter of the Community Services Administration responding to a telephone inquiry from the Board.[6] To miss the May 4, 1976, deadline, the Board relies solely on the March 11, 1976 meeting[7] but, as seen, there was no new submission of material for the record on that date. Since "all factual data from external sources necessary for the decision [had] been actually submitted to the Fed" by January 30, 1976, under *Tri-State Bancorporation, supra,* 524 F.2d at 567, the 91-day period expired on May 4, 1976. Because the Board did not act on these applications until June 7, 1976, its order must be set aside and the applications must be granted as a matter of law. Therefore, we do not reach the merits of the controversy.[8]

---

5. This "retriggering" theory is facially inconsistent with the tolling theory adopted by the Board in a 1972 public opinion letter on Board policy with respect to the statutory time limit requirements under Sections 3 and 4(c)(8) of the Bank Holding Company Act:

"The Board construes the 91-day provision specified in the Act to mean that such period begins to run when, in the judgment of the staff, all information needed to reach a decision in a specific application has been presented to the Board for its consideration. If more information is subsequently requested by the Board, the 91-day period is stayed pending receipt of the new information so that the remaining portion of the period will begin when the new information is submitted to the Board." (App. 149A); CCH Fed.Bank. L.Rep. [1966–1973] Transfer Binder ¶ 95,820 (1972).

Although the first sentence is a pre-*Tri-State Bancorporation* statement, we have been cited to no Board opinion which supercedes the 1972 position on tolling.

6. This 91-day time period was evidently calculated by the Board to run from February 4 when its record section received the letter rather than from February 2 when its clearing unit

received it (see Br. 24–25). For purposes of this case, it does not matter whether the final submission of the record was completed on February 2 or 4.

7. Indeed, the Board concedes in its brief (Br. 24–25) that it was obliged to act on the application by May 4, 1976, if the March 11, 1976 meeting did not retrigger the 91-day period. At oral argument, the Board's counsel tried to release the Board from this concession. However, he could not point us to any external pre-May 4 submission to the Board which was information requested by the Board. Thus even if we would allow the Board to retreat from its concession, its retreat would find no safe haven.

8. The Board argues that a limited foray into the merits is required in order to determine whether an application is at least colorably meritorious. It maintains the 91-day clock was intended to apply to situations where the Board's discretion is involved, claiming that the Board through negligence cannot grant what the statute expressly forbids. However, the Board overlooks

"Congress's declaration implicit in § 1842(b) that it may well be a lesser evil as a matter of

By letter of December 23, 1976, the Board called our attention to *First Lincolnwood Corporation v. Board of Governors of the Federal Reserve System*, 546 F.2d 718 (7th Cir. 1976).[9] However, the ninety-one day period did not run there because the Board acted on January 9, 1976, "well within [the] ninety-one days of the last submission to it by First Lincolnwood on November 8, 1975, of the third quarter financial statements of the Bank" (546 F.2d at 721). Instead of departing from *Tri-State* in *First Lincolnwood*, we expressed accord with the *Tri-State* holding that "the ninety-one day period does not start to run until the final material needed for the Board's decision is received from various interested sources outside the Board" (*Id.*). As seen, the final material needed for the Board's decision here was received on February 2 or 4, 1976 (note 6 *supra*), so that the Board's June 7, 1976, order came too late.

The Board also relies on *Blackstone Valley National Bank v. Board of Governors of the Federal Reserve System*, 537 F.2d 1146 (1st Cir. 1976). However, the holding there was merely that in order to invoke the ninety-one day rule as a "party aggrieved" by denial of an application for a bank holding company to acquire a bank under 12 U.S.C. § 1842, a bank in Blackstone's position must first have participated in the application proceedings before the Board. No such standing problem is presented here. Moreover, apart from *jus tertii* considerations, the applicant in *Blackstone* may have waived its rights under the 91-day statute since it did not raise the issue itself.

This decision will not wreak any havoc at the Board because after *Tri-State* it has been changing its procedures for processing applications. Also, the public interest will

not be put at an undue risk. As we noted in *Tri-State*, since 1974 the Board has had the power to subject bank holding companies to continuing supervision under 12 U.S.C. § 1818(b)(3). See 524 F.2d at 567. In addition, we were advised by Board counsel that the Federal Deposit Insurance Corporation and the State of Illinois can supervise the new bank and apparently, if necessary, respectively revoke approval and permit, whether or not the Board can do so.

The order of June 7, 1976, is vacated and set aside and the applications of petitioner are deemed granted as a matter of law.[10]

---

public policy for a non-meritorious application to be deemed approved by operation of law than to risk allowing a meritorious application to be delayed by federal bureaucracy for more than 91 days." *Tri-State Bancorporation, Inc., supra*, 524 F.2d at 567.

In any event, the relevant regulations make clear that the petitioner's application here was at least colorably meritorious. See notes 1 and 2 *supra*. Moreover, the June 7, 1976, order of the Board denying petitioner's application ad-

mittedly considered the merits of the application—a tacit concession by the Board that the petition was within the Board's discretion to grant or deny.

**9.** The petition for rehearing *en banc* in *First Lincolnwood Corporation* has recently been granted by this Court.

**10.** Petitioner's motion for leave to supplement the record is hereby denied.