**CENTRAL WISCONSIN BANKSHARES, INC., Petitioner,**

v.

**BOARD OF GOVERNORS OF the FEDERAL RESERVE SYSTEM, Respondent.**

No. 76–1603.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 27, 1977.

Decided July 14, 1978.

Matthew J. Iverson, Chicago, Ill., for petitioner.

Michael Kimmel, App. Section, Civil Division, Dept. of Justice, Washington, D. C., for respondent.

Before FAIRCHILD, Chief Judge, COWEN, Senior Judge,* and CUMMINGS, Circuit Judge.

FAIRCHILD, Chief Judge.

This is a petition for review of an order entered May 26, 1976 by the Board of Governors of the Federal Reserve Bank (the Fed), denying petitioner Central Wisconsin Bankshares (Bankshares) application for approval to acquire 80% of the voting stock of Central National Bank of Wausau (Bank). Bankshares contends that the denial was beyond the authority of the Fed because it came more than 91 days after the Fed had a complete record, and thus the application was deemed granted under 12 U.S.C. § 1842(b).[1]

## I. BACKGROUND

Bankshares submitted the 101-page application on July 24, 1975 after approximately six months of negotiation between Bankshares and the Fed concerning the information which should be included in it. From July 24 to December 7, 1975 the Fed solicited and received information relevant to the application from various sources, including a competitor of Bank, Peoples State Bank of Wausau, and the Comptroller of the Currency. Bankshares does not argue that the record should be treated as complete at any time prior to December 7, 1975.

The Fed solicited and received additional material from Bankshares twice after this date. In January, 1976, Bankshares wrote to the Fed raising the possibility that the 91-day period had already run. The Fed responded with a letter dated February 4, 1976 asking several questions related to the issue of whether Bankshares already had some measure of control over Bank. Bankshares responded by letter dated February 20, 1976; the date of receipt of the letter is disputed.

On March 15, 1976, the Fed by telephone requested financial statements from Bankshares for the year ending December 31, 1975. Up to this time, the record only included financial data up through the third quarter of 1975. These data were sent on March 16, 1976. Although there is no record of the date of receipt, this information was necessarily received less than 91 days prior to the challenged order.

The issues are whether either the February 20 letter or the March 16 submission should be considered part of the "complete record" for purposes of the 91-day rule; if so, whether the last submission occurred within 91 days prior to May 26, 1976; and whether Bankshares is estopped from asserting that the two submissions in question were not new and necessary information and did not become part of the "complete record" as that phrase was interpreted in *Tri-State Bancorporation, Inc. v. Bd. of Governors of Federal Reserve System*, 524 F.2d 562 (7th Cir. 1975). We hold that the February 20 letter became part of the complete record for 91-day rule purposes and find that it was received on February 26 or 27, 1976. The order of denial therefore came on the 90th or 91st day and should be

---

* The Honorable Wilson Cowen, Senior Judge of the United States Court of Claims, is sitting by designation.

1. 12 U.S.C. § 1842(b) provides in relevant part:
   In the event of the failure of the Board to act on any application for approval under this section within the ninety-one day period which begins on the date of submission to the Board of the complete record on that application, the application shall be deemed to have been granted.

affirmed. It is unnecessary to reach the questions relating to the March 16 submission.

## II. THE NATURE OF THE 91–DAY RULE

Because there has been some confusion about the interpretation of the 91-day rule we make some preliminary comments. In *North Lawndale Economic Development Corp. v. Bd. of Governors of Federal Reserve System,* 553 F.2d 23 (7th Cir. 1977), in footnote 5, this court recognized, but did not resolve an inconsistency between two theories of the rule. Under the "tolling" theory, represented by a pre-*Tri-State Bancorporation* opinion of the Fed,[2] the Fed staff at some point declares the record to be complete. If the Fed changes its mind and requests new information after that, the 91-day period is tolled or stayed from the date of request until the requested material is received, and the balance of the 91-day period runs thereafter. The other, "retriggering," theory was the unstated assumption underlying both *Tri-State Bancorporation* and *First Lincolnwood Corp. v. Bd. of Governors of Federal Reserve System,* 546 F.2d 718 (7th Cir. 1976). Under this theory an arguably complete record is reopened by a timely request by the Fed which produces information both new and necessary for full consideration. The 91-day period runs anew from the date of receipt by the Fed of such information. Presumably an unrequested submission by the applicant would also be deemed to complete the record anew.

Although the "retriggering" theory seems at first glance to be more favorable to the Fed than the "tolling" theory, the latter actually allows it more control of the process, because the 91-day period does not begin to run at all until the Fed staff declares that its record is complete. The purpose of the 91-day rule was to counteract the dilatoriness of the Fed. *Tri-State Bancorporation, supra* at 564. The rule

would lose much of its effectiveness in serving this purpose if the Fed had discretion to determine when the 91-day period beings to run. Under the "retriggering" theory, any 91-day period of time with no action by the Fed would result in the application being granted. The "retriggering" theory is also more clearly consistent with the statutory language since it allows the Fed a 91-day period for decision after any submission which can be found to complete the record. Thus we conclude that the "retriggering" theory is the correct one.

We recognize that there is still the possibility of abuse in that the Board could

"ask for additional information from the applicant or other agencies when that's really not needed simply to delay the case . . . . ."

Oral argument in *Tri-State Bancorporation,* quoted 524 F.2d at 567. This objection was dealt with in that case.[3]

■ Applying these principles to the case at hand, the Board had 91 days beginning December 7, 1976 in which to consider the application. On the 64th day, February 4, 1976, it requested information on the admittedly relevant issue of whether Bankshares already had some control of the bank it proposed to acquire. Bankshares submitted a lengthy response dated February 20, 1976.

Although it now claims that none of the material in the February 20 letter was new, Bankshares did not, as did the petitioner in *North Lawndale, supra,* merely "[refer] the Board to those portions of the previously submitted materials where the requested information could be found." 553 F.2d at 26. Counsel for the Fed in this case suggested that the course followed by Bankshares resulted in waiver of the claim that the information had already been supplied. However, because the applicant naturally is trying to cooperate to the fullest extent possible with the Fed during the application process, we do not think that waiver or

---

2. *North Lawndale, supra* at n.5.

3. We stated that such conduct would "expose the administrative body to a charge of ˙bad

faith." Moreover, new material would have to be both new and relevant to trigger a new 91-day period.

estoppel should be applied against Bankshares. In addition to the informality of the process, other factors weighing against the application of waiver or estoppel are that the Fed was at least equally aware of any facts that could lead to an application of the 91-day rule, that the Fed had no rule requiring notice that the 91-day rule would be invoked, and that Bankshares did not, by failing to give such notice, in any way deceive the Fed. There is nothing to indicate the Fed would have acted earlier but for the additional submissions—in fact, the Fed maintains that these were necessary to its decision.

Upon an examination of both the application and the February 20 letter, we find that there are several statements in the latter that cannot fairly be said to have been reflected in the application. In answer to Question 1, "Has Applicant been instrumental in the hiring or firing of any individuals employed by Bank?", Bankshares, after repeating the information earlier supplied that two officers of Bank had been supplied by Bankshares in 1966, said, "other than that, the Applicant nor any of its affiliates have had anything to do with the hiring or firing of individuals employed by the Bank." In answer to Question 2, "Is there any agreement or understanding under which the rights of holders of voting securities of Bank are restricted in any way?", Bankshares, in addition to repeating the percentage of Bank stock held by stockholders of Bankshares in 1966 and at present, and that the Bank stock was originally offered to Bankshares stockholders, also said that this offer was "without any supplemental agreements" and that "as far as is known, there are no agreements or understandings under which the rights of holders of voting securities of the Bank are restricted in any way." Similarly, answering Question 3 as to influence by any individuals or by Bankshares over Bank, Bankshares repeated the number of interlocking Directors in 1966 and at present, and stated, "none of them assert any more than their natural interests as Directors of the Bank. They do not assert any particular influence in the overall operations of the Bank." The

answers to Questions 5 and 6 also contain new material: "The undersigned is completely unaware of any stockholders agreement pertaining to Bank and/or Applicant." "[A]s far as is known, the Bank has not requested any help [from Applicant] in establishing hours for business, rates, terms, acceptance of loans, or deposits by Bank. . . ."

It will be noted that all of the portions of the February 20 letter which we have quoted above are negative assertions, that is, statements that there is nothing else to reveal relative to the particular question. It could be argued that putting specific information into the application constituted an implied denial that there was any further information to be included. However, since the information needed by the Fed was under the control of Bankshares, we think it was reasonable to require a specific denial that there were any other connections, besides those specifically mentioned, between Bankshares and Bank.

### III. WHETHER THE FEBRUARY 20 LETTER WAS RECEIVED WITHIN 91 DAYS OF THE MAY 26 ORDER

Normally, when a Court of Appeals reviews an order of an agency such as the Fed, the agency has made findings on the merits, and the court's inquiry is whether the findings are "supported by substantial evidence." See 12 U.S.C. § 1848, the jurisdictional statute in this case.

In a 91-day rule challenge, however, the Fed (as in this case) may not have actually made findings. In addition, the court is not really reviewing an action of the Fed, but its inaction, and any implied or explicit findings by the Fed would be self-serving. Therefore, we concluded that this court, instead of remanding to the Fed for fact-finding, should, itself, be the finder of any facts which are not related to the merits of the application, but to the lapse of time which might have caused the grant of the application to become mandatory. We asked both parties to submit evidence relating to the date of receipt of the February 20 letter. On the basis of this evidence, we

find that the letter was received on either February 26 or 27, 1976.

All mail addressed to the Fed is delivered to its mail room. Deliveries are made four times a day, five days per week. After the mail is sorted, it is taken to a central messenger room. This procedure occurs four times a day on the same day as the mail is delivered to the mail room. The mail is then sorted according to the floor where it is to be delivered and forwarded to floor messenger rooms which then deliver the mail to the addressee located on that floor. Typically, floor messengers deliver the mail within 2½ hours after mail is received by the central messenger room. Mail addressed to Mr. Baldwin B. Tuttle (Deputy General Counsel of the Fed) is examined by Mr. Tuttle several times a day and certainly within 24 hours of receipt by his secretary.

If a matter pertains to a matter previously assigned to a staff attorney (as in the present case), it is immediately forwarded to the Legal Division docket room where it is entered in the Legal Division's daily log and transmitted to the appropriate staff attorney. In the case of documents relevant to a bank holding company application, the staff attorney is responsible for forwarding the original document to the Clearing Unit of the Board's Division of Banking Supervision and Regulation.

In this case, the February 20 letter was entered in the daily log of the Legal Division's docket room on February 27, 1976. The letter was also time-stamped by the Clearing Unit on February 27, at 11:27 AM. It was received by the permanent Records Section on March 1, 1976.

█ We conclude that the date of receipt by the mail room should control when the 91-day period begins to run rather than the receipt date of either the Clearing Unit or Records Section. Any other result would

allow the Fed to determine for itself when the 91-day period would begin to run. Allowing the Fed to control the triggering of the 91-day period is clearly inconsistent with the statutory purpose of preventing undue delay by the Fed in processing bank holding company applications.

From the evidence before us, it is impossible to determine with certainty the exact date when the February 20 letter was first delivered to the Fed's mail room. We are satisfied, however, that the letter was received no earlier than February 26,[4] one day before it was recorded by the Legal Division's docket room and the Clearing Unit. Since February 26 is within the 91-day period, the order denying Bankshares' application is valid.

The petition for review is DENIED.

---

4. We recognize that the delay between the February 20 date of the letter and its receipt on February 26 or 27 appears substantial. A six-day delay, however, is not improbable. More importantly, there is no evidence to indicate that the letter, dated February 20, was actually mailed on that date.