CITICORP, Petitioner,

v.

**BOARD OF GOVERNORS OF the FEDERAL RESERVE SYSTEM, Respondent.**

No. 103, Docket 78–4039.

United States Court of Appeals, Second Circuit.

Argued Nov. 1, 1978.

Decided Jan. 2, 1979.

John E. Hoffman, Jr., New York City (Shearman & Sterling, New York City, John J. Roche, Andrew S. O'Connor, New York City, of counsel), for petitioner.

Freddi Lipstein, Atty., Appellate Section, Civ. Div., Dept. of Justice, Washington, D. C. (Barbara Allen Babcock, Asst. Atty. Gen., Ronald R. Glancz, Atty., Appellate Section, Civ. Div., Dept. of Justice, Washington, D. C., Neal L. Petersen, Gen. Counsel, J. Virgil Mattingly, Atty., Board of Governors of the Federal Reserve System, Washington, D. C., of counsel), for respondent.

Before FEINBERG, TIMBERS and MOORE, Circuit Judges.

FEINBERG, Circuit Judge:

Citicorp, a bank holding company under the Bank Holding Company Act of 1956, as amended, 12 U.S.C. §§ 1841–1850, petitions

for review of an order of the Board of Governors of the Federal Reserve System, denying Citicorp's application to retain ownership of Advance Mortgage Corporation.[1] Citicorp contends that under a specific provision in the Act, the application had to be deemed granted by the Board's failure to rule on it within the statutory time limit of 91 days. Citicorp also argues that even if the Board's order was timely, the Board applied incorrect legal standards in denying the application and the order is not supported by substantial evidence. For reasons given below, we deny the petition for review and affirm the order of the Board.

## I

■ The Bank Holding Company Act generally prohibits bank holding companies from engaging in nonbank activities. 12 U.S.C. § 1843. In 1970, the Act was amended to cover for the first time one-bank holding companies such as Citicorp. Bank Holding Company Act Amendments of 1970, 84 Stat. 1760. Absent approval of the Board, these companies must cease nonbank activities and divest shares of nonbank companies by December 31, 1980.[2] 12 U.S.C. § 1843(a)(2). In ruling on bank holding company applications to retain ownership or control of a company engaged in nonbank activities, the Board is instructed to consider various factors affecting the public interest, more fully discussed in Part III below. 12 U.S.C. § 1843(c)(8). Section 4(c) of the Act, 12 U.S.C. § 1843(c), provides that if the Board fails to act upon such an application within 91 days, the application is "deemed . . . granted."

In July 1970, petitioner Citicorp, now the second largest banking corporation in the United States, acquired all the voting shares of Advance Mortgage Corporation, now the nation's second largest mortgage banking company. Citicorp applied to the Board in 1973 to retain Advance, but was unsuccessful.[3] In 1977, Citicorp again submitted an application, the subject of this appeal.

At this point, the precise dates of various events become potentially significant, so we will list them in more detail than might otherwise be necessary. Citicorp submitted its application to the Federal Reserve Bank of New York on October 28, 1977.[4] On November 18, 1977, the Reserve Bank requested additional information, which Citicorp delivered to the Bank on December 5, 1977. On December 13, the Bank forwarded the application to the Board in Washington, D. C., and sent Citicorp a letter formally acknowledging receipt of the application. The Board's public notice, dated December 30, 1977, soliciting comments on the application, was published on January 9, 1978 in the Federal Register. On January 17, Citicorp released its 1977 year-end financial statements and routinely forwarded a copy to the Board. Also on January 17, the Board received a staff memorandum from the New York Reserve Bank containing its analysis of, and recommendation on, Citicorp's proposed retention of Advance. The public comment period closed on January 27, 1978. Around February 3, 1978 the Board requested the 1977 year-end financial statements of Advance, which Citicorp supplied on February 8, stating that by doing so it did not acquiesce in the tolling or re-starting of the 91-day statutory time limit. On March 10, 1978 the Board requested, and Citicorp furnished, information concerning the extent of Advance's dependence on Citicorp for managerial resources.

The Board denied Citicorp's application on March 13, 1978 for reasons discussed in greater detail below. These may for

1. This court has jurisdiction under 12 U.S.C. § 1848.

2. There are exceptions to the divestiture requirement not pertinent here.

3. The Board denied this application in December 1973, but the ruling was without prejudice to renewal prior to the statutory deadline should Citicorp believe more persuasive evidence of public benefits had become available.

4. Board regulations require applications to be filed with the Federal Reserve Bank in the district in which the applicant is located. 12 C.F.R. § 262.3(b).

present purposes be briefly summarized as holding that Citicorp had not sufficiently justified an exemption. Shortly thereafter, Citicorp filed its petition for review in this court.

## II

As already indicated, the key provision of the Act on this petition for review is section 4(c), which provides in pertinent part:

> In the event of the failure of the Board to act on any application for an order under paragraph (8) of this subsection within the ninety-one-day period which begins on the date of submission to the Board of the complete record on that application, the application shall be deemed to have been granted.

The crucial question with regard to the timeliness of the Board's order under this section is when the 91-day statutory period began, an issue not previously considered in this circuit.[5] Citicorp contends that since the Board received no outside comments on the proposed retention of Advance, the application itself became the "complete record on that application." Thus, the time period started running on December 5, 1977, the date when Citicorp submitted the final additions to the application to the New York Reserve Bank, and the application was "deemed" granted 91 days later, on March 6, 1978.

The Board argues that Congress intended the 91-day period to commence only after all the data relevant to the Board's decision has been assembled. Thus, according to the Board, the earliest the time clock could have begun to run is December 13, when the application was forwarded from the New York Reserve Bank to the Board in Washington. Since this was only 90 days prior to the Board's March 13 order denying the application, that order was timely and the automatic grant of section 4(c) was not triggered. The Board goes on, however, to suggest a number of alternative theories which would start the running of the 91-day time period much later, e. g., publication of notice in the Federal Register, expiration of the comment period after such notice and receipt of the year-end financials of Citicorp and Advance, the staff recommendation from the New York Reserve Bank and the information concerning Advance's dependence on Citicorp. Petitioner replies that the dates proposed by the Board relate to events within the Board's control, and that use of those occurrences to trigger the 91-day limit would render the statutory time constraint meaningless. Citicorp also asserts that the year-end financial statements did not provide any new data and that a Board request for irrelevant and unnecessary material should not re-start the time period.

The issues raised by these volleys back and forth are not simply resolved, since the language of section 4(c) is susceptible of conflicting interpretations. But contrary to petitioner's contention, the phrases "complete record" and "submission to the Board" imply that Congress at least did not intend the 91-day period to start as soon as a completed application is filed with a local Reserve Bank. The legislative history tends to support this view. The 91-day requirement of section 4(c), enacted as part of the 1970 amendments, was obviously a response to sluggish Board action in the

---

5. *The Seventh Circuit, however, had decided several cases raising similar issues. See Tri-State Bancorporation, Inc. v. Board of Governors of Federal Reserve System,* 524 F.2d 562 (7th Cir. 1975) (construing both § 1842(b) and § 1843(c) ); *First Lincolnwood Corp. v. Board of Governors of Federal Reserve System,* 546 F.2d 718 (7th Cir. 1976) (construing § 1842(b)), modified en banc on other grounds, 560 F.2d 258 (1977), reversed, —— U.S. ——, 99 S.Ct. 505, 58 L.Ed.2d 484 (1978); *North Lawndale Economic Development Corp. v. Board of Governors of Federal Reserve System,* 553 F.2d 23 (7th Cir. 1977) (construing both § 1842(b) and § 1843(c)); *Central Wisconsin Bankshares, Inc. v. Board of Governors of Federal Reserve System,* 583 F.2d 294 (7th Cir. 1978) (construing § 1842(b)). In addition, one case on the issue is pending in the Ninth Circuit, *BankAmerica Corp. v. Board of Governors of Federal Reserve System,* Civ. No. 77–1005 (N.D.Cal.1977), appeal docketed, No. 77–3629 (9th Cir. Oct. 4, 1977). See also *Blackstone Valley Nat'l Bank v. Board of Governors of Federal Reserve System,* 537 F.2d 1146 (1st Cir. 1976).

past. See H.R.Rep. 387, 91st Cong., 1st Sess. 13 (1969). Cf. *White v. Mathews,* 559 F.2d 852 (2d Cir. 1977), cert. denied, 435 U.S. 908, 98 S.Ct. 1458, 55 L.Ed.2d 500 (1978). Yet, even a chief proponent of the new rule, when asked whether the 91-day period allowed enough time for consideration of complex applications, responded that the time would not begin to run until the application was "cleaned up." [6] He explained that the statutory period would start when "[the Fed] was ready to investigate at the Board level and felt all they had to do was deliberate and not hunt for additional facts and send it back." [7] It is apparent that Congress was aware of the practice whereby applications were "cleaned up" by the local Reserve Bank and then forwarded to the Board. In this context, the words "submission to the Board" are significant, and we reject petitioner's argument that they mean "receipt within the Federal Reserve System."

A holding that the time period did not start until receipt of the application by the Board on December 13, 1977 would dispose of this case,[8] and it is tempting to stop there. We believe, however, that sound judicial administration requires consideration of at least one later starting point suggested by the Board. The statute requires "due notice and opportunity for hearing" upon an application such as the one here involved. 12 U.S.C. § 1843(c)(8). See also 12 C.F.R. § 225.4(b)(2). Even if no comments are received, the lack of objection to the proposal is an important fact for the Board, which is not confirmed until the close of the comment period. Further, a rule that if there are no comments the time period starts upon receipt of the application, but if comments are received the time period is re-started, would place the Board in somewhat of a dilemma. In order to assure the full 91 days for careful deliberation, the Board would have to assume that no comments would be received and begin intensive deliberations during the comment period. Then if there were comments that altered the focus of inquiry or changed the information available to the Board, the initial deliberations might become useless. We do not think Congress intended to force the Board either to waste time in possibly premature deliberations or to sacrifice part of its 91 days for decision-making. Thus we hold that ordinarily the 91-day period does not begin until at least expiration of the period for comments upon an application.[9]

We recognize that the purpose of the statute could be undercut if the local Reserve Bank unduly delays in forwarding an application to the Board, or if the Board delays in publishing notice, or allows an unreasonably long period for comments. Concern with Board control of the commencement of the time period also has been expressed by the Seventh Circuit in its opinions dealing with the 91-day time limit.[10] Most recently, that court stated:

> The purpose of the 91-day rule was to counteract the dilatoriness of the Fed. The rule would lose much of its effectiveness in serving this purpose if the Fed had discretion to determine when the 91-day period begins to run. (Citation omitted).

*Central Wisconsin Bankshares, supra* note 5, 583 F.2d at 296.

6. J. Harvie Wilkinson, Jr., testifying on behalf of the Association of Registered Bank Holding Companies, Hearings On Bills to Amend the Bank Holding Company Act of 1956, Before the Committee on Banking and Currency, United States Senate, 91st Cong., 2d Sess. 961 (1970).

7. Id.

8. Such a holding is apparently consistent with the Seventh Circuit position. See *North Lawndale, supra* note 5, 553 F.2d at 24, 26–27.

9. The Seventh Circuit rule is that the time clock starts when "the final material needed for the Fed's decision is received from the various interested sources outside of the Fed," *Tri-State, supra* note 5, 524 F.2d at 566, followed in *First Lincolnwood, supra* note 5, 546 F.2d at 721; *North Lawndale, supra* note 5, 553 F.2d at 28. Thus it would appear that in that circuit the time period could start earlier than the close of the comment period, see *North Lawndale, supra,* 553 F.2d at 26–27.

10. *Tri-State, supra* note 5, 524 F.2d at 566; *North Lawndale, supra* note 5, 553 F.2d at 27.

■ Although Congress did not place an explicit deadline on completion of the Board's pre-deliberation activities, we think the Board's discretion to determine the start of the 91-day time period is limited by the implicit statutory requirement that these activities be accomplished with reasonable promptness. Since the Board has chosen to have applications initially processed by local Reserve Banks, see note 4 *supra,* it is the Board's responsibility to oversee their performance of this activity. Thus any undue delay at the Reserve Bank level in forwarding the application should be subtracted from the 91 days allotted to the Board. It is also the duty of the Board promptly to publish notice upon receipt of an application and to provide for a reasonably short comment period. Cf. 12 C.F.R. § 225.4(b)(2). We were informed at oral argument that an internal unpublished Board regulation provides for publication of notice within two weeks of receipt of an application and for a comment period of thirty days.[11] These objective guidelines adequately curtail the potential for Board control or manipulation of the time limit. However, we suggest that the Board add reasonably defined time periods to its already formally adopted and published regulations on this topic so the public and applicants can be assured of no undue delays.

The Board further suggests that after the period allowed for notice and comment, there may be instances when new data,

such as the financial statements in this case, first become available. Or; the Board may discover during deliberations that further information would be helpful. The Board urges us to hold that the 91-day period does not start to run until such additional material is received, a position accepted by the Seventh Circuit so long as the new material is both relevant and necessary to the Board's decision.[12] The case for insuring that the Board is able to obtain and use such information after the close of the comment period is obviously a strong one, but whether receipt of such new data should re-start the entire 91-day period is more questionable. The potential for manipulation of the time constraint is greatest at this stage, as the deadline grows closer.[13] Moreover, as petitioner points out, new financial statements become available every quarter, and theoretically could be used to extend the time limit indefinitely, thus nullifying Congressional intent. Although the Seventh Circuit's relevant and necessary requirements in theory limit the Board's power to re-start the time period, in practical effect these restraints might be difficult to enforce. Virtually all new data about an applicant will be relevant to the Board's decision. And, without performing its own detailed analysis, and comparing the additional information with that previously available, it is difficult for a reviewing court to determine whether the new data was "necessary" to the decision.[14]

11. A 1972 Federal Reserve opinion letter stated:

> It should be noted that, at a minimum, the complete record on a given application cannot be ready for submission to the Board prior to the expiration of any comment period. Normally, notice of an application is published in the Federal Register within five to seven days following acceptance of the application by a Reserve Bank. Generally 30 days are allowed for comment from interested persons, from the public, and from Federal and State supervisory authorities.

Letter from Federal Reserve System to Mr. Donald L. Rogers, Executive Director, Association of Registered Bank Holding Companies, Nov. 14, 1972, quoted in part in C. Blaine, Federal Regulation of Bank Holding Companies at 3–7 (1973).

12. *Central Wisconsin Bankshares, supra* note 5, 583 F.2d at 296–97 & n.3; *North Lawndale, supra* note 5, 553 F.2d at 27; *First Lincolnwood, supra* note 5, 546 F.2d at 721; *Tri-State, supra* note 5, 524 F.2d at 566.

13. The Seventh Circuit has recognized this possibility and has indicated that the Board cannot gain the benefit of the re-starting doctrine if it is found to have acted in bad faith. *Central Wisconsin Bankshares, supra* note 5, 583 F.2d at 296 & n.3, citing *Tri-State, supra* note 5, 524 F.2d at 567.

14. The Board has been upheld in the two reported decisions in which it asserted that new information from sources outside the Board re-started the time period. *First Lincolnwood, supra* note 5, 546 F.2d at 721; *Central Wisconsin Bankshares, supra* note 5, 583 F.2d at 296–

It is arguable, therefore, that a request for new information after the close of the comment period should not restart the 91-day period, but should merely toll the running of that period until the information is supplied by the applicant.[15] Such a tolling doctrine would still allow the Board freely to obtain additional relevant information and would encourage the applicant to comply with requests promptly. However, there are problems with this view, as well, not the least of which is that the Board may discover very late in the 91-day period that new information might be significant in its decision, and then, after obtaining the information, be left with only a few days in which to decide. Under the circumstances, we leave resolution of such issues to another day, when they are crucial to determination of the case before us.

▮ We do believe it prudent, however, to dispose of the further argument of the Board that the 91-day time limit does not ordinarily begin to run until the Board receives the staff reports of local Reserve Banks on an application that has already been submitted to the Board. In *Tri-State, supra* note 5, 524 F.2d at 566, the Seventh Circuit held that reports from the Board's own staff are not part of the "complete record" for purposes of commencement of the 91-day period. The Court reasoned that staff reports are part of the decisional process of the Board and that allowing their completion to determine the start of the 91-day period would give the Board complete control over the time period. We agree with this reasoning and think that it applies equally to staff reports from local Banks after an application is forwarded to the Board in Washington.[16]

▮ We now turn to application of these general rules to the facts of the present case. We begin analysis with the date of Citicorp's submission of additional material for the application, December 5, 1977. The New York Reserve Bank forwarded the application to the Board within eight days thereafter and we think this was a reasonable period in which to examine the added material and determine that the application was complete. It appears that the Board received the application on December 14, 1977,[17] and notice was published in the Federal Register on January 9, 1978. Thus, it is apparent that the Board took a little longer to publish notice than the two weeks specified in its internal regulation. See text at note 11 *supra*. Under the Board's own internal policies, the notice should have been published by December 28, 1977 and the comment period should have closed around January 27, 1978. Therefore, we find that the time period began no earlier than January 28, 1978 and that the Board's March 13 order, clearly within 91 days of this date, was timely.

### III

▮ Petitioner also argues that the Board did not apply the correct legal stan-

98. In *North Lawndale, supra* note 5, the court rejected the Board's argument that an oral conference between representatives of the applicant and Board personnel re-started the time period. 553 F.2d at 27. However, in that case the Board conceded that no new facts were presented at the conference. Id. In *Tri-State, supra* note 5, 524 F.2d at 564, 566, the court rejected the Board's argument that staff reports re-started the time period, but the Board did not argue that any new outside information had been received.

15. The Board itself adopted a tolling doctrine in its Nov. 14, 1972 opinion letter, *supra* note 11. However, the Board's rule gave its staff complete discretion to determine when the 91-day period started, a position with which we disagree.

The Seventh Circuit recently rejected a tolling theory, adopting the re-starting doctrine discussed in text at notes 12–14 *supra*. *Central Wisconsin Bankshares, supra* note 5, 583 F.2d at 296.

16. Since the report from the New York Reserve Bank was received by the Board in this case prior to the close of the comment period, the issue is not determinative here. However, since such reports appear to be common, we think it wise judicial administration to dispose of this issue now.

17. The copy of the application in the record appears to have been stamped "77 Dec 14" and "Received Clearing Unit."

dards in denying Citicorp's application and that the order is not supported by substantial evidence. We conclude that the Board correctly interpreted the statutory standards and that there is ample support for its order.

■ The applicable provision of the statute is section 4(c)(8), which provides that the prohibition on bank holding companies' ownership of nonbanking companies shall not apply to:

> shares of any company the activities of which the Board after due notice and opportunity for hearing has determined (by order or regulation) to be so closely related to banking or managing or controlling banks as to be a proper incident thereto. In determining whether a particular activity is a proper incident to banking or managing or controlling banks the Board shall consider whether its performance by an affiliate of a holding company can reasonably be expected to produce benefits to the public, such as greater convenience, increased competition, or gains in efficiency, that outweigh possible adverse effects, such as undue concentration of resources, decreased or unfair competition, conflicts of interests, or unsound banking practices. In orders and regulations under this subsection, the Board may differentiate between activities commenced de novo and activities commenced by the acquisition, in whole or in part, of a going concern  .    .   . .

This section has been interpreted to mean that the acquired activity must be "closely related to banking," and that the reasonably expected public benefits of the particular proposal must outweigh possible adverse effects. See, e. g., *Ass'n of Bank Travel Bureaus v. Board of Governors of Federal Reserve System*, 568 F.2d 549, 551–52 (7th Cir. 1978). The legislative history indicates that the burden is on the applicant affirma-

tively to establish the net public benefit of its proposal,[18] and the Board's findings may not be overturned if they are supported by substantial evidence.[19]

There was no serious issue before the Board with regard to the requirement that the activities of Advance Mortgage Corporation be "closely related to banking" since the Board has determined by regulation that mortgage banking meets that test. 12 C.F.R. § 225.4(a)(1) and (3). At issue before us is whether the Board correctly applied the factors specified in the second sentence of section 4(c)(8). The Board found that the acquisition of Advance lessened competition in the mortgage banking field by eliminating Citicorp as a potential de novo entrant, that the combination resulted in undue concentration of resources and that Citicorp's interest in Advance weakened Citicorp financially. The Board considered the public benefits which Citicorp asserted the acquisition produced—Advance's product innovation, expanded services, commitment of funds to neighborhood preservation projects and its countercyclical role in mortgage acquisitions. However, the Board concluded that some of the claimed benefits had anticompetitive effects, that others could have been achieved through Citicorp's de novo entry into mortgage banking and that the actual public benefits of the acquisition did not outweigh the adverse effects.

■ Focusing particularly on the Board's finding that the acquisition would result in undue concentration of resources, petitioner asserts that the Board improperly condemned size alone and found no specific adverse effects flowing from the concentration. But the specific statutory reference to "undue concentration of resources" as one of the "possible adverse effects" reflected a Congressional concern over control of economic resources that contemplated a more searching inquiry than the usual anti-

---

18. See, e. g., H.R.Rep. 1747, 91st Cong., 2d Sess. 19 (1970) (Conf.Rep.).

19. See 12 U.S.C. § 1848; *Alabama Ass'n of Insurance Agents v. Board of Governors of Federal Reserve System*, 533 F.2d 224, 246 (5th Cir. 1976); *Independent Bankers Ass'n of Geor-*

*gia v. Board of Governors of Federal Reserve System*, 170 U.S.App.D.C. 278, 289, 516 F.2d 1206, 1217 (1975). Cf. *Board of Governors of Federal Reserve System v. First Lincolnwood Corp.*, —— U.S. ——, 99 S.Ct. 505, 58 L.Ed.2d 484 (1978).

trust considerations of ease of entry and relative market shares. Cf. H.R.Rep. 1747, *supra* note 18, at 17. We agree with the conclusion of the Fifth Circuit that "Congress believed that concentration of economic resources in a single entity beyond a certain point was harmful regardless of the proven existence of any anticompetitive effects of such concentration." *Alabama Association of Insurance Agents v. Board of Governors of Federal Reserve System*, 533 F.2d 224, 251 (5th Cir. 1976), amended and rehearing denied, 558 F.2d 729 (1977), cert. denied, 435 U.S. 904, 98 S.Ct. 1448, 55 L.Ed.2d 494 (1978). Although this does not mean that Congress has condemned bigness as bad per se, we think Congress did commit to the expertise of the Board the task of determining when size alone makes the combination of banking and nonbanking corporations against the public interest. With regard to this factor, we conclude that the Board in this case applied the proper legal standard and the record supports its conclusion.

The Board also justifiably found that the combination produced anticompetitive effects. It is clear that competition between Citicorp and Advance has been lost in the origination of construction and income-producing property loans and that there was a basis for finding that the acquisition caused loss of Citicorp as a potential competitor in the residential mortgage loan business. In determining the anticompetitive effects of the acquisition, the Board properly took into account the likelihood that Citicorp would have entered into mortgage banking de novo or through acquisition of a smaller firm. As indicated above, the statute specifically permits the Board to "differentiate between activities commenced de novo and activities commenced by the acquisition, in whole or in part, of a going concern. . . . ."

The weighing of possible adverse effects against reasonably expected public benefits is committed to the expertise of the Board, and in this case the Board's findings are supported by the evidence. In conclusion, we hold that the Board's March 13, 1978 order denying Citicorp's application to re-

tain Advance Mortgage Corporation was timely and in conformity with the governing statutory standards and the evidence. We deny Citicorp's petition for review and affirm the order of the Board.