NCNB CORPORATION, Petitioner,

v.

The BOARD OF GOVERNORS OF the
FEDERAL RESERVE SYSTEM,
Respondent.

No. 78–1363.

United States Court of Appeals,
Fourth Circuit.

Argued March 14, 1979.

Decided June 15, 1979.

Mark A. Weiss, Washington, D. C. (Mary C. Carter, Covington & Burling, Washington, D. C., on brief), for petitioner.

Freddi Lipstein, App. Staff, Civil Division, Dept. of Justice, Washington, D. C. (Barbara Allen Babcock, Asst. Atty. Gen., Ronald R. Glancz, Michael F. Hertz, App. Staff, Civil Division, Dept. of Justice, Neal

L. Petersen, Gen. Counsel, J. Virgil Mattingly, Bronwen Mason, Bd. of Governors of the Federal Reserve System, Washington, D. C., on brief), for respondent.

Before WINTER and HALL, Circuit Judges, and KAUFMAN,* District Judge.

WINTER, Circuit Judge:

NCNB Corporation (NCNB) petitions for review of an order of the Board of Governors of the Federal Reserve System (Board) refusing NCNB permission to retain ownership of its subsidiaries Superior Insurance Company (Superior Insurance) and Superior Claims Service, Inc. (Superior Claims). Permission was sought pursuant to § 4(c)(8) of the Bank Holding Company Act of 1956, as amended, 12 U.S.C. § 1843(c)(8), but it was denied upon the Board's finding that NCNB had failed to demonstrate a reasonable basis for its position that the business activities of Superior Insurance and Superior Claims are "so closely related to banking or managing or controlling banks as to be a proper incident thereto." The issues are: (1) should NCNB's application for permission to retain ownership of Superior Insurance and Superior Claims be deemed to have been granted under § 4(c) of the Act, 12 U.S.C. § 1843(c), for failure of the Board to act on the application within the 91-day period after the submission date of the complete record on the application, and (2) was the Board's ruling that NCNB had failed to meet its burden of proof arbitrary or capricious or an abuse of discretion.

We answer both questions in the negative and therefore affirm the Board's order.

### I.

NCNB is a one-bank holding company. It was not subject to the Bank Holding Company Act until December 31, 1970, when the Act was amended to extend its application to one-bank holding companies. Until that date, NCNB was entirely free of any regulation in the Act restricting its ownership of non-banking businesses. In 1969, NCNB had acquired ownership of TranSouth Financial Corporation (TranSouth) (formerly Stephenson Finance Company). Superior Insurance, a subsidiary of TranSouth, is in the business of *underwriting* property, casualty, credit accident and health, and credit life insurance sold by TranSouth and NCNB's subsidiary bank to borrowers to insure personal property serving as collateral for loans and to provide for repayment of the loan in the event of the borrower's illness, injury or death. Superior Claims, another subsidiary of TranSouth, was organized by NCNB after it acquired TranSouth to adjust insurance claims primarily for NCNB's subsidiaries.

When the Act was amended in 1970, NCNB became subject to its restrictions. For purposes of this case, the significant one is § 4(a), 12 U.S.C. § 1843(a). A bank holding company is prohibited under that statute from owning any non-banking subsidiary. An exemption is provided, however, in § 4(c)(8) of the Act, 12 U.S.C. § 1843(c)(8), permitting the holding company to own

shares of any company the activities of which the Board after due notice and opportunity for hearing has determined (by order or regulation) to be so closely related to banking or managing or controlling banks as to be a proper incident thereto. In determining whether a particular activity is a proper incident to banking or managing or controlling banks the Board shall consider whether its performance by an affiliate of a holding company can reasonably be expected to produce benefits to the public [listing examples] . . . that outweigh possible adverse effects [listing examples]

· · · ·

The determination made by the Board under § 4(c)(8) is generally interpreted as involving two discrete elements. *See, e. g., National Courier Association v. Board of Governors of Federal Reserve System*, 170

---

* Honorable Frank A. Kaufman, United States District Judge for the District of Maryland, sitting by designation.

U.S.App.D.C. 301, 304–05, 516 F.2d 1229, 1232–33 (1975). First, the Board must determine whether the non-banking activity in question is "closely related" to banking. Although the statute permits the Board to make this determination by order, it has preferred to proceed by regulations outlining classes of non-banking activity that qualify as "closely related." *See* 12 C.F.R. § 225.4(a) (1978). Second, the Board must determine whether participation of the holding company in the "closely related" activity at issue would result in "public benefits." This second determination is made by the Board by individual consideration of the circumstances of each applicant under § 4(c)(8). If the proposed activity falls within one of the categories already approved as "closely related," then the Board publishes notice of the application in the *Federal Register* for public comment on the "public benefits" issue. *Id.* § 225.-4(b)(2). If the proposed activity is not within one of the approved categories, then the Board will publish notice "only if it believes that there is a reasonable basis for the holding company's opinion" that the proposed activity is closely related to banking. *Id.* § 225.4(a).

On January 24, 1978, NCNB filed a six-part application with the Federal Reserve Bank of Richmond (Richmond Bank) to retain six of TranSouth's non-banking activities after December 31, 1980, the statutory deadline for compliance by one-bank holding companies with the provisions of the Act. *See* 12 U.S.C. § 1843(a)(2). Four of these activities fell within the categories of "closely related" activities enumerated in the Board's regulations, and Board approval as to their retention was ultimately given. But the regulations did not define the activities of Superior Insurance and Superior Claims as "closely related," and retention of them is the subject of this litigation.

The Richmond Bank transmitted the application to the Board on February 14, 1978, but it is evident that the Richmond Bank undertook some study of the application before forwarding it. Its letter of transmittal recited that it had requested additional information from NCNB which would be forthcoming and it identified certain individuals in its examining department, its research department, and its legal department as the caseworkers who were handling the application. On the same date (February 14), the Richmond Bank formally acknowledged receipt of the application to NCNB, stating that "[t]he application has been reviewed and it is understood that certain additional information pertaining to product markets of the [subsidiaries] will be forthcoming." On March 7, the Richmond Bank requested from NCNB copies of financial statements which had been filed by Superior Insurance and Superior Claims with the Insurance Commissioner of South Carolina, and NCNB submitted this information on March 13.

The Richmond Bank's report on the application was not forwarded to the Board until April 18, 1978. In the interim, members of the Board's staff studied the application and made some investigation and inquiries concerning it. The Board's staff submitted its recommendations to the Board in memoranda dated April 10, April 20, and May 8, 1978, respectively, and the Board entered its order on May 10, 1978, reflecting its determination that NCNB had not demonstrated that there is a reasonable basis for its opinion that the activities of Superior Insurance and Superior Claims are closely related to banking, and that the Board found no such reasonable basis. As a consequence, the Board advised NCNB that notice of its application would not be published in the *Federal Register* and the Board would not initiate a rule-making proceeding with respect to those non-banking activities.

## II.

NCNB's contention that its application must be deemed to have been granted because of the Board's failure to act upon it within 91 days from its filing is grounded upon the provisions of § 4(c) of the Act, 12 U.S.C. § 1843(c):

> In the event of the failure of the Board to act on any application for an order under paragraph (8) of this subsection

within the ninety-one-day period which begins on the date of submission to the Board of the complete record on that application, the application shall be deemed to have been granted.

It is manifest that if the application was submitted within the meaning of § 4(c) on January 24, 1978, the date it was filed with the Richmond Bank, the Board's order of May 10, 1978 was untimely; and pursuant to § 4(c), the application must be deemed to have been granted. But if the application is not deemed to have been submitted to the Board until on or after February 8, 1978, the Board's order was within the permissible period and it is not vulnerable to being set aside for untimeliness.

The legislative history of § 4(c), discussed in *Tri-State Bancorp., Inc. v. Board of Governors of Federal Reserve System*, 524 F.2d 562, 564–65 (7 Cir. 1975), makes clear that Congress intended to force speedy Board determinations of applications made to it. But, according to the words of the statute, the running of the 91-day period begins, not necessarily on the date of *filing* an application, but on the date of "submission to the Board of the complete record on that application . . . ." Both *Tri-State* and *Citicorp v. Board of Governors of Federal Reserve System*, 589 F.2d 1182 (2 Cir. 1979), have addressed the question of determining the date of submission to the Board of the complete record. *Tri-State* adopted the rule that the period begins to run "when the final material needed for the Fed's decision is received from the various interested sources outside of the Fed, which ordinarily would be the applicant and governmental agencies other than the Fed." 524 F.2d at 566. In order for the receipt of material from an outside source to "retrigger" the 91-day period, the material must be "both new and relevant." *Central Wisconsin Bankshares, Inc. v. Board of Governors of Federal Reserve System*, 583 F.2d 294, 296 n.3 (7 Cir. 1978).

In *Citicorp*, it was said that "the phrases 'complete record' and 'submission to the Board' [contained in § 4(c)] imply that Congress at least did not intend the 91-day

period to start as soon as a completed application is filed with a local Reserve Bank," 589 F.2d at 1186, and the court held the period did not begin to run when the application was filed. *Id.* at 1187. Instead, calling attention to the fact that the statute and the regulations provided for due notice and opportunity for hearing on an application for permission to retain a non-banking subsidiary, the court held that "ordinarily the 91-day period does not begin until at least expiration of the period for comments upon an application." *Id.* The court emphasized that the Board must publish notice with reasonable promptness and that the period for comment must not be unreasonably long, and it noted that unpublished internal Board regulations provide for publication of notice within two weeks of receiving the application and for a comment period of thirty days.

■ Because the Seventh Circuit deems controlling the date of actual receipt of information and the Second Circuit the expiration of the period for comment, their decisions may be inconsistent. But apparently both courts agree, as do we, that the 91-day period does not begin until on or after the date that the local Federal Reserve Bank, after "cleaning up" the application, has (or reasonably should have) submitted the record to the Board. The Second Circuit, in *Citicorp*, examined the legislative history of the 91-day provision, and it determined that Congress was aware of the practice whereby the local bank would conduct initial processing of an application before forwarding it to the Board and that Congress did not intend the 91-day period to begin running until this "cleaning up" process had been completed. *Id.* at 1186–87. While the Seventh Circuit has not considered the problem in similar depth, its decision in *North Lawndale Economic Development Corp. v. Board of Governors of Federal Reserve System*, 553 F.2d 23 (7 Cir. 1977), appeared to agree with the applicant's position in that case that the 91-day period could not begin to run until the local Reserve Bank had forwarded the application to the Board after completing its own

initial processing. *See id.* at 26. The Second Circuit, in *Citicorp,* considered itself to be in accord with the Seventh Circuit on this principle. *See* 589 F.2d at 1187 n.8. *See also BankAmerica Corp. v. Board of Governors of Federal Reserve System,* 596 F.2d 1368 (9 Cir. 1979).

█ Application of this principle to the instant case decides it. The Richmond Bank transmitted the "cleaned up" application to the Board on February 14, less than 91 days from May 10, the date of the Board's decision. The application had been filed with the Richmond Bank on January 24, 1978, so that it was held and not submitted to the Board for 21 days after the date of its filing. We do not think that this was an unreasonable delay. By comparison, in *Citicorp* the local bank requested additional information from the applicant exactly 21 days after the date the application was filed, it was supplied three weeks later, the application was forwarded to the Board eight days thereafter, 589 F.2d at 1185, and the court did not consider this passage of time unreasonable.

Thus, we hold that in the instant case the Board's final action was within the 91-day period because the period did not begin to run until at least the date on which the Richmond Bank transmitted the application to the Board. In applying this test, however, we expressly do not decide whether the period may not have begun to run later upon the happening of some of the subsequent events, *e. g.,* the furnishing by NCNB of additional financial data, the expiration of a notice and comment period, the making of staff reports, etc. We reserve our views as to these until they are presented in a case requiring us to express them.

### III.

The Board found that there was no reasonable basis for NCNB's claims that the proposed activities are "closely related to banking," and it therefore declined to publish notice of the claim in the *Federal Register.* NCNB does not ask us to decide the merits of the claim, nor does it deny that the Board may forego such notice if the claim lacks a reasonable basis. But it contends that in the instant case the Board's refusal to give its claim full-fledged consideration, under the standard notice-and-hearing procedure, was arbitrary and an abuse of discretion. NCNB notes that included among the long list of types of non-banking activities approved by Board regulation are the sale of many types of credit-related insurance and the underwriting of credit-related life insurance and accident and health insurance. *See* 12 C.F.R. § 225.-4(a)(9)–(10) (1978). Since the Board considers the selling of credit-related insurance, including property and casualty insurance, and the underwriting of life and accident and health insurance as "closely related" activities, NCNB argues that there must be at least a reasonable basis for the position that underwriting property and casualty insurance and adjusting claims with respect thereto are "closely related" activities.

The Board's order did not seek to compare NCNB's proposed activities with similar activities already approved. Rather, it relied on three criteria which the District of Columbia Circuit has instructed it to consider in deciding a "closely related" question:

1. Banks generally have in fact provided the proposed services.

2. Banks generally provide services that are operationally or functionally so similar to the proposed services as to equip them particularly well to provide the proposed service.

3. Banks generally provide services that are so integrally related to the proposed services as to require their provision in a specialized form.

*National Courier Association v. Board of Governors of Federal Reserve System,* 170 U.S.App.D.C. 301, 309, 516 F.2d 1229, 1237 (1975). The Board's order stated that NCNB's application contained no evidence to indicate that the proposed activities met any of these three criteria, and it therefore denied the application.

 From our examination of the record, we, too, cannot find evidence to indicate that these criteria have been met. Absent this proof, we do not think that the Board acted arbitrarily or capriciously or abused its discretion. The Board's order is

*AFFIRMED.*