**REPUBLIC OF TEXAS CORPORATION,**
Petitioner,

v.

**BOARD OF GOVERNORS OF the FEDERAL RESERVE SYSTEM,**
Respondent.

No. 80–1985.

United States Court of Appeals,
Fifth Circuit.

**Unit A**

June 24, 1981.

Marshall M. Searcy, George C. Lamb, III, Dallas, Tex., for petitioner.

J. Virgil Mattingly, Jr., William J. Sweet, Jr., Bd. of Governors, Federal Reserve System, Washington, D. C., for respondent.

Before BROWN, WISDOM and RANDALL, Circuit Judges.

RANDALL, Circuit Judge:

Petitioner Republic of Texas Corporation ("Republic") is a multibank holding company under the Bank Holding Company Act of 1956, as amended, 12 U.S.C.A. §§ 1841–1850 (West 1980). By order dated August 20, 1980, the Board of Governors of the Federal Reserve System ("the Board") denied Republic's application under section 3(a) of the Act, 12 U.S.C. § 1842(a) (Supp. III 1979), for advance approval of Republic's proposed acquisition of The Citizens National Bank of Waco, a commercial bank located in Waco, Texas ("CNB"). *Republic of Texas Corporation*, 66 Fed.Res.Bull. 787 (1980). Pursuant to section 9 of the Act, 12

U.S.C. § 1848 (1976), Republic petitions this court for review of the Board's order.

Republic first argues that because the Board failed to comply with the so-called "91–day rule" created by section 3(b) of the Act, 12 U.S.C. § 1842(b) (Supp. III 1979), Republic's application must be deemed to have been granted by operation of law. The proper operation of the 91–day rule is a question of first impression in this circuit. After examining the statute and its legislative history, the related regulations promulgated by the Board, and the decisions of the other circuits that have considered the 91–day rule, we conclude below in part III of this opinion that Republic's application cannot be deemed to have been granted by operation of law.

In the alternative, Republic argues that the record does not contain substantial evidence to support the Board's rejection of Republic's application on anticompetitive grounds. This issue is directly controlled by our recent holding in *Mercantile Texas Corp. v. Board of Governors of the Federal Reserve System*, 638 F.2d 1255 (5th Cir. 1981). Following the teachings of that case, which we discuss below in part IV of this opinion, we vacate the Board's order and remand Republic's application to the Board for reconsideration and more thorough findings.

## I. THE STATUTORY AND REGULATORY FRAMEWORK FOR THE PROCESSING OF APPLICATIONS UNDER SECTION 3 OF THE BANK HOLDING COMPANY ACT

### A. The Statutory Language

Section 3(a) of the Bank Holding Company Act of 1956, as amended, 12 U.S.C. § 1842(a) (Supp. III 1979), makes it unlawful for any bank holding company to acquire control of more than 5% of any class of voting shares of any bank, unless the bank holding company has obtained prior approval of the acquisition from the Board.[1]

---

1. Section 3(a) of the Bank Holding Company Act of 1956, as amended, provides in pertinent part as follows:

It shall be unlawful except with the prior approval of the Board [of Governors of the Federal Reserve System] ... (3) for any

Section 3(b) of the Act, 12 U.S.C. § 1842(b) (Supp. III 1979), requires that immediately upon receiving an application for Board approval pursuant to section 3(a), the Board must notify either the Comptroller of the Currency or the appropriate state authority of the application.[2] The statute explicitly directs that the Comptroller or the state authority shall have 30 days in which to submit his views and recommendations on the proposed acquisition. If the Comptroller or state authority opposes the acquisition, the Board must hold a hearing. The statute explicitly sets out an expeditious timetable within which such a hearing must take place.[3]

Section 3(b) goes on to impose a deadline on the Board's deliberations upon an application:

> In the event of the failure of the Board to act on any application for approval under this section *within the ninety-one-day period which begins on the date of submission to the Board of the complete record on that application*, the application shall be deemed to have been granted.

12 U.S.C. § 1842(b) (Supp. III 1979) (emphasis added). It is the proper application of

bank holding company to acquire direct or indirect ownership or control of any voting shares of any bank if, after such acquisition, such company will directly or indirectly own or control more than 5 per centum of the voting shares of such bank . . . .
12 U.S.C. § 1842(a) (Supp. III 1979). Section 2(a)(1) of the Act defines "bank holding company" as "any company which has control over any bank or over any company that is or becomes a bank holding company by virtue of [the Act]." 12 U.S.C. § 1841(a)(1) (Supp. III 1979).

2. In addition, § 11(b) of the Act requires that [t]he Board shall immediately notify the Attorney General of any approval by it pursuant to section [3 of the Act] of a proposed acquisition, merger, or consolidation transaction. . . . [Except when the Board has found an emergency exists that requires urgent action,] the transaction may not be consummated before the thirtieth calendar day after the date of approval by the Board. Any action brought under the antitrust laws arising out of an acquisition, merger, or consolidation transaction approved under section [3 of the Act] shall be commenced prior to the earliest time under this subsection at which the transaction approval under [section 3 of the Act] might be consummated. The commencement of such an action shall stay the effectiveness of the Board's approval unless the court shall otherwise specifically order. 12 U.S.C. § 1849(b) (Supp. III 1979). *See also* 12 C.F.R. § 225.3(d)(2) (1980) ("[a]s required by the Act, the Board notifies the Attorney General of the United States of Board action on any transaction proposed under this section"). The Board informs us that in practice, it forwards a copy of each § 3 application, *prior* to a Board decision thereupon, to both the Antitrust Division of the Department of Justice and the Federal Deposit Insurance Corporation.

3. The statutory language dealing with the solicitation of views and recommendations from the Comptroller or appropriate state supervisory authority provides in pertinent part as follows:

> *Upon receiving from a company any application for approval under [§ 3 of the Act], the Board shall give notice to the Comptroller of the Currency, if the applicant company or any bank the voting shares of which are sought to be acquired is a national banking association or a District bank, or to the appropriate supervisory authority of the interested State, if the applicant company or any bank the voting shares of which are sought to be acquired is a State bank, in order to provide for the submission of the views and recommendations of the Comptroller of the Currency* or the State supervisory authority, as the case may be. *The views and recommendations shall be submitted within thirty calendar days of the date on which notice is given,* or within ten calendar days of such date if the Board advises the Comptroller of the Currency or the State supervisory authority that an emergency exists requiring expeditious action. If the thirty-day notice period applies and if the Comptroller of the Currency or the State supervisory authority so notified by the Board disapproves the application in writing within this period, the Board shall forthwith give written notice of the fact to the applicant. Within three days after giving such notice to the applicant, the Board shall notify in writing the applicant, and the disapproving authority of the date for commencement of a hearing by it on such application. *Any such hearing shall be commenced not less than ten nor more than thirty days after the Board has given written notice to the applicant of the action of the disapproving authority.* The length of any such hearing shall be determined by the Board, but it shall afford all interested parties a reasonable opportunity to testify at such hearing. At the conclusion thereof, the Board shall, by order, grant or deny the application on the basis of the record made at such hearing.
> 12 U.S.C. § 1842(b) (Supp. III 1979) (emphasis added).

this provision, hereinafter referred to as section 3(b)'s "91-day rule," that we must decide in the case at bar.

## B. The Board's Implementing Regulations

The Board's implementing regulations require that a bank holding company's application for Board approval be filed initially with the Federal Reserve Bank of the district in which the head office of the bank holding company is located, rather than directly with the Board.[4] The Reserve Bank investigates and prepares a report on the relevant facts; the report is submitted to the Board along with the Reserve Bank's recommendations on the application.[5] In practice, the Reserve Banks usually cooperate with applicants to "clean up" applications before they are sent to the Board.[6]

4. One regulation provides in pertinent part that "[a]ny application should be sent to the Federal Reserve Bank of the district in which the head office of the parent banking organization is located, except as otherwise specified on application forms, and that [Reserve] Bank will forward it to the Board *when appropriate.*" 12 C.F.R. § 262.3(c) (1980) (emphasis added). Another regulation provides in pertinent part that

[a]n application for approval by the Board of any transaction requiring approval under section 3(a) of the [Bank Holding Company] Act shall be filed with the Federal Reserve Bank. A separate application shall be filed with respect to each bank the voting shares of which are sought to be acquired by an existing bank holding company or nonbanking subsidiary thereof.

12 C.F.R. § 225.3(a) (1980).

5. The applicable regulation provides in pertinent part as follows: "In every case, the Reserve Bank makes such investigation as may be necessary, and, except when acting pursuant to delegated authority, reports the relevant facts, with its recommendation, to the Board." 12 C.F.R. § 262.3(d) (1980).

6. The Board's Program Director for Banking Structure made the following public comments in 1974:

Upon completion of a draft of an application, much trouble, time, and expense can often be avoided if arrangements are made to review the application with Federal Reserve Bank personnel. Any Reserve Bank will be glad to discuss a draft with you, point out instances where misunderstanding may exist, and tell you if there are areas where more information is required. By all means be certain to discuss any unusual aspects of the proposal with the Reserve Bank. This assistance, let me stress, is technical only, and in no way affects the final decision on the case. Provision of the required information in the correct way can only help expedite that decision—whether it be yea or nay. But it can save you, and us, a great deal of expense and time.

. . . .

You may have heard that the System attempts to act on applications within ninety days. That is true. But it means within ninety days of having before it a complete application. All too often we have been forced to delay a decision on an application because of failure on the part of the applicant to complete all prerequisite actions, or because the application is inadequate in some other way. You may say that the System is responsible for not having told you what to do. Not so. While we are here to help, completing the application is your responsibility. After all, the requirements are clearly spelled out in the general instructions of the application forms. . . . In the final analysis it is the responsibility of the applicant to provide an application complete in all respects, including completion of prerequisite steps.

. . . .

In order to process most cases within a ninety-day period, the Board and the Reserve Banks have adopted the policy that where substantive information is found lacking in an application, that application will not be accepted by the System. Rather, it will be returned to the applicant for insertion of such material, and then it may be resubmitted. On some occasions, additional information of a less critical nature may be requested without returning the application. In these cases, [the] applicant is requested to submit the additional information simultaneously to the Board and to the Reserve Bank within a specified period of time in order that the overall processing time not be extended. Sometimes, even near the end of the processing period, it is necessary to obtain additional information from the applicant. In these cases, the sooner [the] applicant submits the information, the less delay will be encountered before the Board's final decision.

. . . .

. . . Obviously, an application must be legally sufficient or we will not process it unless formal demand to do so is made by the applicant. If so, a favorable decision cannot be expected. . . . It is with the second test, that is, the test of informational adequacy, that we encounter difficulty. Here we are saying that what we want is an application containing information necessary for a reasonable man to make a judgment as to whether it should be approved or denied. It is on this point—how much information does a reasonable man need to make a decision—

Upon receipt of the application and the Reserve Bank's report and recommendations, the Board's staff considers all relevant matter and submits comments to the Board.[7] The Board then "takes such action as it deems appropriate in the public interest."[8]

The Board's regulations recognize, but do not elaborate upon, section 3(b)'s requirement that the Board notify either the Comptroller of the Currency or the appropriate state banking authority "[u]pon receiving" a section 3 application. One regulation provides that "[t]he Board will consider comments on an application from . . . a bank supervisory authority to which notification of receipt of an application has been given, only if such comment is received by the Secretary of the Board within 30 days of the date of the letter giving such notification."[9]

Section 3 of the Act does not explicitly mandate the provision of notice to, and an opportunity for comment from, the public at large. Nonetheless, in determining whether to approve an application under section 3, one factor that the Board must consider is whether any anticompetitive effects of the proposed acquisition would be "clearly outweighed in the public interest by the probable effect of the transaction in meeting the convenience and needs of the community to be served." 12 U.S.C.A. § 1842(c) (West 1980).[10] Accordingly, Congress must have contemplated that the Board might find it appropriate to solicit public comment on a proposed acquisition. Unfortunately, the Board's regulations relating to public notice are, charitably speaking, somewhat less than clear. The regulations apparently envision two distinct types of public notice—the first through newspaper publication, and the second through publication in the *Federal Register.*

The timing and content of the required notice is clearly detailed only as to the former type—*i. e.,* the newspaper publication. The Board's regulations require that a bank holding company which seeks to acquire control of a bank must, during the two weeks *before* filing with the Reserve Bank its application for Board approval, publish notice of its intentions in newspapers of general circulation in both the com-

---

that opinions differ. Understandably, applicants generally feel that their applications, as submitted, contain enough information to indicate clear approval. . . . This may indeed be so, but it is not always so clear to those who must make the decision, that is, a Federal Reserve Bank acting under delegated authority or the Board. So the wise applicant will assume a large burden of the proof, and make certain that his application supports with fact those public benefits contended. Leavitt, *What the Fed Likes to See in a Bank Holding Company Application,* 91 Banking L. J. 320, 321–25 (1974).

7. The applicable regulation provides in pertinent part as follows: "In the light of consideration of all relevant matter presented or ascertained, the Board's staff prepares and submits to the Board comments on the subject." 12 C.F.R. § 262.3(d) (1980).

8. The applicable regulation provides as follows:
 *Action on applications.* The Board takes such action as it deems appropriate in the public interest. Such documents as may be necessary to carry out any decision by the Board are prepared by the Board's staff. With respect to actions taken by a Federal Reserve Bank under delegated authority, statements and necessary documents are pre-

pared by the staff of such Federal Reserve Bank.
12 C.F.R. § 262.3(f) (1980) (emphasis in original).

9. 12 C.F.R. § 262.3(e) (1980). Another regulation provides in pertinent part that
 the Board will by order grant or deny the [section 3] application after receipt by it of advice that the Comptroller of the Currency or the appropriate State authority, as the case may be, does not disapprove the application, or, *if no such advice is received, after the expiration of 30 days from the date of receipt of the copy of the application by the Comptroller of the Currency or such State authority.*
 12 C.F.R. § 225.3(d)(1) (1980) (emphasis added).

10. With regard to the "convenience and needs" standard in this and related contexts, see generally *Board of Governors of the Federal Reserve System v. First Lincolnwood Corp.,* 439 U.S. 234, 99 S.Ct. 505, 58 L.Ed.2d 484 (1978); Carstensen, *Regulating Banking in the Public Interest: The Case for an Open Approach to Chartering and Branching,* 57 Texas L.Rev. 1085, 1123–25 (1979).

munity in which the bank holding company has its head offices and the community in which the bank to be acquired is located. The notice must contain the name of the bank holding company, the subject matter of its application, the location at which the bank holding company proposes to engage in business, and an invitation to the public to submit written comments relating to the application to the appropriate Reserve Bank no later than 30 days after the date of publication of the first notice.[11]

11. As in effect at the time of Republic's application in early 1980, the regulations provided in pertinent part as follows:

*Notice of applications.* (1) In the case of applications—

 . . . .

(vi) By a bank holding company to acquire ownership or control of shares or assets of a bank, or to merge or consolidate with any other bank holding company,

the applicant shall, prior to filing such application, cause to be published on the same day of each of 2 consecutive weeks a notice containing the name of the applicant or applicants, the subject matter of the application, the location at which the applicant proposes to engage in business, and an invitation to the public to give written comment upon the application to the appropriate Federal Reserve Bank no later than 30 days after the date of publication of the first notice. Such notice shall be published in a newspaper of general circulation in . . . (E) the community or communities in which the head offices of the largest subsidiary bank, if any, of an applicant and of each bank, shares of which are to be directly or indirectly acquired, are located in the case of applications under section 3 of the Bank Holding Company Act. 12 C.F.R. § 262.3(b) (1980) (emphasis in original). These regulations were adopted by the Board in 1978 "[i]n order to effectuate an orderly procedure for the processing of applications, and to insure that comments or requests for a hearing with respect to applications are handled in a uniform manner." 43 Fed.Reg. 49974 (1978).

The regulations have subsequently been amended by the Board, chiefly to require the use of a standardized form of notice to be published in the classified legal notices section of the newspaper, and to require submission of the application to the Reserve Bank immediately after the first notice is published. The amended regulations, which became effective on February 1, 1981, provide in pertinent part as follows:

*Notice of applications.* (1) In the case of applications—

 . . . .

(vi) By a bank holding company to acquire ownership or control of shares or assets of a bank, or to merge or consolidate with any other bank holding company,

the applicant shall cause to be published on the same day of each of two consecutive weeks a notice in the form prescribed by the Board. The notice shall be placed in the classified advertising legal notices section of the newspaper, and the first notice may appear no more than ninety calendar days prior to acceptance by the Reserve Bank of the application. *The notice must provide an opportunity for the public to give written comment on the application to the appropriate Federal Reserve Bank for at least thirty days after the date of publication of the first notice.* In addition, between publication of the first and second notice, the applicant shall submit to the appropriate Reserve Bank for acceptance copies of the application, together with a copy of the notice as it appeared in the newspaper. Such notice shall be published in a newspaper of general circulation in . . . (E) the community or communities in which the head offices of the largest subsidiary bank, if any, or [*sic*] an applicant and of each bank, shares of which are to be acquired, are located in the case of applications under section 3 of the Bank Holding Company Act. 45 Fed.Reg. 81543, 81544 (1980) (second emphasis added) (to be codified at 12 C.F.R. § 262.3(b)). The accompanying comments explain that "[t]hese notices are important in calling the public's attention to an applicant's plans and giving the public a chance to comment on these plans." *Id.* at 81543. The revisions are designed "to improve the effectiveness of the notices." *Id.* at 81544.

Most recently, the Board has promulgated a new regulation that permits it or the Reserve Bank having authority over a particular application to waive or curtail notice and comment requirements when appropriate. The new regulation also allows waiver or curtailment of any other procedural rule that might prevent immediate or expeditious action when appropriate. The new regulation, which became effective upon its publication on January 21, 1981, provides as follows:

*Waiver.* The Board, or the officer or Reserve Bank authorized to approve an application, may waive or modify any procedural requirements for that application prescribed or cited in this section and may excuse any failure to comply with them upon a finding that immediate action is necessary to prevent the probable failure of a bank or company or that an emergency exists requiring expeditious action. 46 Fed.Reg. 5861 (1981) (emphasis in original) (to be codified at 12 C.F.R. § 262.3(*l*)).

The Board's regulations relating to publication in the *Federal Register* are considerably less clear, and correspondingly more troublesome. The primary regulation relating to *Federal Register* publication provides simply that "[n]otice of receipt of all section 3 applications . . . is published in the *Federal Register*." [12] That regulation does not specifically require that this notice be published within any particular period of time after receipt of the application, and it does not distinguish between receipt of the application by a Reserve Bank and receipt of the "cleaned up" application by the Board. Neither does it explicitly provide for a public comment period—much less a public comment period of any particular length. While another regulation, which purports to detail the Board's policies on considering public comments and requests for hearings, clearly envisions the receipt of public comments following the *Federal Register* publi-

cation, that regulation cannot fairly be said to evidence a Board policy on the length of such comment periods. [13]

## II. FACTS RELATING TO THE PROCESSING OF REPUBLIC'S APPLICATION TO ACQUIRE CNB

As required by the Board regulations discussed above, Republic published notice of its proposed acquisition of CNB in newspapers of general circulation in both Dallas and Waco. The notices appeared in the *Dallas Times Herald* on January 23 and January 30, 1980, and in the *Waco Tribune-Herald* on January 25 and February 1, 1980. The notices provided in part that "[p]ersons wishing to comment on this proposal should submit their views in writing within 30 days of [the] date of [this] notice to the Federal Reserve Bank of Dallas," and gave a mailing address for the Reserve Bank.

**12.** The entire regulation reads as follows:

The Board issues each week a list that identifies section 3 and section 4 and merger applications received and acted upon during the preceding week by the Board or the Reserve Banks pursuant to delegated authority. Notice of receipt of all section 3 applications and of section 4(c)(8) applications acted upon by the Board is published in the *Federal Register.*

12 C.F.R. § 262.3(i)(1) (1980). The precise meaning of this language is hard to determine, for these two short sentences are in some ways a paradigm of grammatical ambiguity. The use of the phrase "received *and acted upon*" in the first sentence would seem to contemplate the issuance of such an identifying list only *after* a Board determination to grant or refuse an application that it had received. It is unclear what, if any, connection there may be between the list that is referred to in the first sentence and the *Federal Register* publication that is referred to in the second sentence. The second sentence could logically be read to mean that notice will be published in the *Federal Register* of the receipt of all applications made under either § 3 or § 4(c)(8), but that such notice will be published only *after* such applications have been acted upon by the Board. In this appeal, the Board has interpreted the second sentence to mean that notice will be published of the receipt of § 3 applications *prior* to a Board decision thereupon. This interpretation is consistent with the regulation's predecessor, which more elegantly provided as follows:

The Board issues each week a list that identifies holding company and merger applications received during the preceding week.

Notice of receipt of each holding company application is published in the *Federal Register.*

12 C.F.R. § 262.3(f)(1) (1973).

**13.** The regulation provides in pertinent part as follows:

*Submission of comments and requests for hearing.* The Board will consider a comment or request for hearing with respect to an application only *if it is in writing and is sent to the Secretary of the Board or the appropriate Federal Reserve Bank on or before the date prescribed in the Federal Register notice with respect to applications under sections 3 or 4 of the Bank Holding Company Act* or, in the case of other applications, the date specified in the newspaper notice with respect to such applications, or where no such date is prescribed, on or before the 13th day after the date such notice is first published. . . . Notwithstanding the foregoing, the Board may, in its sole discretion and without notifying the parties, take into consideration the substance of comments with respect to an application, (but not requests for hearing) that are not received within the time period provided herein.

12 C.F.R. § 262.3(e) (1980) (second emphasis added). *This language cannot be said to impose a limit on the length of the comment period that may be specified in the Federal Register notice;* rather, it merely provides that whatever comment period *is* specified will ordinarily be adhered to by the Board.

On February 15, 1980, Republic filed with the Reserve Bank its application to acquire CNB. During the following months, the Reserve Bank requested and received from Republic supplemental information relating to the merits of the application. This information was incorporated into the record on Republic's application. The Reserve Bank received Republic's last relevant submission on April 24, 1980.

On May 1, 1980, the Reserve Bank notified Republic by letter that its application was being forwarded to the Board for consideration. The Reserve Bank advised Republic that its "application ha[d] been reviewed preliminarily and appear[ed] informationally complete," although it warned that "further analysis of the application by this Reserve Bank or Board staff could reveal information deficiencies that require either additional information or return of the application." On that same day, the Reserve Bank forwarded copies of Republic's application to the Comptroller of the Currency, the Texas Commissioner of Banking, and the Antitrust Division of the Department of Justice. The Reserve Bank's cover letter to the Comptroller requested that he send his written views and recommendations to the Board within 30 days.

The Board received the application and accompanying record from the Reserve Bank on May 2. On May 8, the Board forwarded notice of the application to the *Federal Register* for publication. This notice was duly published on May 16; it directed that any comments or requests for a hearing should be received by the Board no later than June 9.[14]

By letter dated May 6, the Texas Commissioner of Banking informed the Board that he had no views or recommendations on Republic's application; this letter was received by the Board on May 9. The period for comments from the Comptroller of the Currency ended on June 2, but the Board received no comments or recommendation from the Comptroller. Nor did the Board receive any comments from the public by June 9 in response to the *Federal Register* notice.

By letter dated August 18—some 109 days after the Board received Republic's application and the accompanying materials from the Reserve Bank—Republic notified the Board that it deemed its application to have been approved by operation of law under the 91-day rule. On August 20, however, the Board issued its order denying Republic's application.

## III. THE PROPER OPERATION OF THE 91–DAY RULE

### A. General Principles Developed by Our Sister Circuits

The 91-day rule had its origins in the Bank Holding Company Act Amendments of 1970, Pub.L.No.91–607, § 102(2), 84 Stat. 1760, 1763, *reprinted at* [1970] U.S.Code Cong. & Ad.News 2057, 2060. The legislative history indicates that the 91-day rule was intended to correct one principal criticism of the original version of the Act—*i. e.*, that "the Federal Reserve in administering the act ha[d] been unduly slow in rendering decisions on applications made."[15] Gener-

---

**14.** The text of the *Federal Register* notice provided as follows:

Republic of Texas Corporation, Dallas, Texas, has applied for the Board's approval under section 3(a)(3) of the Bank Holding Company Act (12 U.S.C. 1842(a)(3)) to acquire 100 per cent of the voting shares of The Citizens National Bank of Waco, Waco, Texas. The factors that are considered in acting on the application are set forth in section 3(c) of the Act (12 U.S.C. 1842(c)).

The application may be inspected at the offices of the Board of Governors or at the Federal Reserve Bank of Dallas. *Any person wishing to comment on the application*

*should submit views in writing* to the Secretary, Board of Governors of the Federal Reserve System, Washington, D.C. 20551, *to be received not later than June 9, 1980.* Any comment on an application that requests a hearing must include a statement of why a written presentation would not suffice in lieu of a hearing, identifying specifically any questions of fact that are in dispute and summarizing the evidence that would be presented at a hearing.

45 Fed.Reg. 32429 (1980) (emphasis added).

**15.** H.R.Rep.No.91–387, 91st Cong., 2d Sess. 13 (1970). *See also Bank Holding Company Act Amendments: Hearings on H.R.6778 Before*

ally speaking, the formal congressional reports on the 1970 amendments provide little indication of how the 91-day rule was intended to operate in practice.[16] The language of section 3(b) does, however, speak of the "submission *to the Board* of the *complete record* on [an] application," rather than of the submission of a complete *application* to the Board or to the Reserve Banks, and the hearings on the 1970 amendments indicate that Congress knew of the Board's practice of requiring that an application first be submitted to a Reserve Bank

for "cleaning up" before its formal submission to the Board.[17] Thus, it appears that Congress did not intend for the 91-day period to begin running until some point *after* the cleaning-up process and the receipt by the Board of the "complete record" on an application. The crucial question of statutory construction is what Congress meant when it used the phrase "complete record on [an] application."

Although the meaning to be accorded this language is a question of first impression in this circuit, the Second, Fourth, Seventh,

---

the *House Comm. on Banking and Currency,* 91st Cong., 1st Sess. 228 (1969) (statement of Board Chairman Martin, acknowledging that "[o]ne of the criticisms that has been made of the Federal Reserve Board, where we have seven men as opposed to a one-man agency, we have taken a lot longer than others to make a decision. . . . [O]ne of the criticisms that has been leveled at us is that there has been undue delay in getting decisions out of the Federal Reserve Board"); 115 Cong.Rec. 32898 (1969) (statement of Rep. Widnall of the House Committee on Banking and Currency that "[t]here had been some complaints that the Board had been too slow in acting upon holding company applications. A 90-day action requirement was added [to H.R.6778] under which within 90 days after the Board has received a completed application, it must act to approve or deny, as otherwise the application will be deemed approved").

16. *E. g.,* S.Rep.No.91–1084, 91st Cong., 2d Sess. —— (1970), *reprinted at* [1970] U.S.Code Cong. & Ad.News 5519, 5542 (noting only that § 102(2) of the 1970 amendments, which added the 91-day rule to § 3(b) of the 1956 Act, "would provide that if the Board fails to act within a 91-day period following submission of the complete record of any application for approval of acquisition of bank shares or assets, the application shall be deemed to have been granted").

17. A chief proponent of the 91-day rule gave the following testimony in the Senate committee hearing:

Both the House Banking and Currency Committee and the House recognized that there had been undue delays in processing applications under section 4(c)(8) of the act. To remedy this situation, H.R.6778 places a 90-day time limit on decisions regarding functionally related activities under section 4(c)(8) and eliminates the mandatory hearing requirement of that section. This 90-day limit is comparable to the 90-day time limit now required on applications under the Savings and Loan Holding Company Act [, 12 U.S.C.

§§ 1730a(e)(1)(B), 1730a(e)(2) (1976)]. *We believe that this time limit should also apply to applications to acquire banks pursuant to section 3 of the act.* The same reasons for a time limit apply to applications under both sections. The new Chairman of the Federal Reserve Board has recognized this problem by administratively applying a 90-day time limit on all applications. We applaud this action, but believe this mandate should be written into law.

*One-Bank Holding Company Legislation of 1970: Hearings on S.1052, S.1211, S.1664, S.3823, and H.R.6778 Before the Senate Comm. on Banking and Currency,* 91st Cong., 2d Sess. 953 (1970) (statement of J. Harvie Wilkinson, Jr., on behalf of the Association of Registered Bank Holding Companies) (emphasis added). Senator Bennett's questioning is also enlightening:

Senator BENNETT. I have been interested in what you say about the 90-day limitations. Is it possible that there could be so many applications, or that an application could be so complicated that the Federal Reserve Board couldn't meet a 90-day limit?

Mr. WILKINSON. There is always that possibility, but the Fed has has [*sic*] a very effective, and sometimes we think when we are submitting an application, a very acute control on this, in that *the application does not get a formal notice of receipt by them until it is cleaned up.*

Therefore, *the 90 days doesn't start to run until they have it in clean form.* That helps them a lot.

Senator BENNETT. So, in fact, the Fed could not receive the application until it was ready to hand down the decision. Is that what you are saying?

Mr. WILKINSON. Until it was ready to investigate at the Board level and felt *all they had to do was deliberate* and not hunt for additional facts and send it back.

*Id.* at 961 (emphasis added).

and Ninth Circuits [18] have addressed in varying degrees either the 91-day rule of section 3(b) or the comparable 91-day rule of section 4(c) of the Act.[19] While their decisions do not easily lend themselves to generalizations, there are certain principles as to which there is no disagreement.

■ First, after considering both the legislative history discussed above and the implication of the "submission to the Board" language of the statute, our sister circuits have uniformly held that, at a minimum, the 91-day period does not begin to run immediately upon the acceptance by the local Federal Reserve Bank of the completed application. *E. g., NCNB Corp. v. Board of Governors of the Federal Reserve System*, 599 F.2d 609, 612–13 (4th Cir. 1979); *Citicorp v. Board of Governors of the Federal Reserve System*, 589 F.2d 1182, 1186–87 (2d Cir.), *cert. denied*, 442 U.S. 929, 99 S.Ct. 2860, 61 L.Ed.2d 297 (1979). We agree and so hold.

■ Second, our sister circuits are also in agreement that "staff reports and recommendations of the [Board] are no part of the 'complete record' within the statutory contemplation. Such internal communications are merely a part of the decisional process in determining the result to be reached on the basis of the record which has been submitted.... [T]he Congressional intent here was to define 'complete record' as meaning the facts upon which the agency would pass, not the internal documents relating to the process of that passing." *Tri-State Bancorporation, Inc. v. Board of Governors of the Federal Reserve System*, 524 F.2d 562, 566 (7th Cir. 1975). *Accord, BankAmerica Corp. v. Board of Governors of the Federal Reserve System*, 596 F.2d 1368, 1378 (9th Cir. 1979); *Citicorp*, 589 F.2d at 1189. *Cf. North Lawndale Economic Development Corp. v. Board of Governors of the Federal Reserve System*, 553 F.2d 23, 27 (7th Cir. 1977) (oral discussions between applicant and Board's staff concerning facts already in Board's possession was not part of the "complete record"). Again, we agree, and so hold.

**18.** The First, Sixth, and Eighth Circuits have adverted to 91-day rules of §§ 3(b) and 4(c), but have not based a decision thereupon. *See Memphis Trust Co. v. Board of Governors of the Federal Reserve System*, 584 F.2d 921, 926 (6th Cir. 1978) (declining to reach bank holding company's argument that its § 4(c)(8) application had been granted by operation of § 4(c)'s 91-day rule, because bank holding company had challenged Board's denial of application too late and in the wrong court); *Grandview Bank & Trust Co. v. Board of Governors of the Federal Reserve System*, 550 F.2d 415, 422 (8th Cir.), *cert. denied*, 434 U.S. 821, 98 S.Ct. 64, 54 L.Ed.2d 78 (1977) (affirming Board's grant of bank holding company's § 3 application on the merits over the complaints of a competitor, and therefore declining to address bank holding company's defensive arguments that application had been independently granted by operation of 91-day rule); *Blackstone Valley National Bank v. Board of Governors of the Federal Reserve System*, 537 F.2d 1146, 1148 (1st Cir. 1976) (because bank had not participated in administrative proceedings before the Board on bank holding company's § 3 application to acquire it, bank was not a "party aggrieved" for purposes of 12 U.S.C. § 1848 (1976), and hence could not argue before court of appeals that bank holding company's application had been granted by operation of 91-day rule when bank holding company had not sought review of Board's denial of application).

Most of the cases that deal directly with the 91-day rules are discussed in Annot., 38 A.L.R. Fed. 919 (1978 & 1980 Supp.).

**19.** Section 4 of the Act, 12 U.S.C. § 1843 (1976 & Supp. III 1979) generally prohibits bank holding companies from engaging in nonbank activities through their subsidiaries, unless they obtain approval of the Board to obtain or retain ownership or control of such companies. Section 4(c) of the Act creates an important exception to this general prohibition; it provides in pertinent part as follows:

The prohibitions in this section shall not apply to ...

....

(8) shares of any company the activities of which the Board after due notice and opportunity for hearing has determined (by order or regulation) to be so closely related to banking or managing or controlling banks as to be a proper incident thereto....

In the event of the failure of the Board to act on any application for an order under paragraph (8) of this subsection within the 91-day period which begins on the date of submission to the Board of the complete record on that application, the application shall be deemed to have been granted.

12 U.S.C. § 1843(c) (1976 & Supp. III 1979). See also note 17, *supra*.

Third, our sister circuits agree on a general definition of "complete record" as comprising all final material needed for the Board's decision that is received from the various interested sources outside of the Board, and that the 91-day period should begin to run upon the Board's receipt of all of this material. *BankAmerica*, 596 F.2d at 1378; *Central Wisconsin Bankshares, Inc. v. Board of Governors of the Federal Reserve System*, 583 F.2d 294, 296–97 (7th Cir. 1978); *North Lawndale*, 553 F.2d at 27; *First Lincolnwood Corp. v. Board of Governors of the Federal Reserve System*, 546 F.2d 718, 721 (7th Cir. 1976), *modified on other grounds on rehearing en banc*, 560 F.2d 258 (7th Cir. 1977), *rev'd on other grounds*, 439 U.S. 234, 99 S.Ct. 505, 58 L.Ed.2d 484 (1978); *Tri-State*, 524 F.2d at 566. We agree with this general definition, and hold that as a general matter, the 91-day period begins to run when the Board receives from the various interested, external sources the final material relevant to and necessary for its decision on an application.[20]

Our sister circuits differ, however, as to more subtle applications of these general principles. For example, the Seventh and Ninth Circuits have held that a "record can be 'complete' on a number of successive occasions. It first becomes complete when the staff of the Board receives the application itself and any information the Board has in good faith requested from the applicant and/or other interested parties." *BankAmerica*, 596 F.2d at 1378. But the entire 91-day period may be "retriggered" if the record is subsequently supplemented, either by an unrequested submission from outside the Board or by a submission in response to a good faith Board request for additional information, so long as the newly submitted material is neither irrelevant nor cumulative. *Id.* *Accord, Central Wisconsin*, 583 F.2d at 296. The Second Circuit, by contrast, has expressed doubts about this "retriggering" theory, noting that "[t]he case for insuring that the Board is able to obtain and use [relevant and necessary] information ... is obviously a strong one, but whether the receipt of such new data should re-start the entire 91-day period is more questionable." *Citicorp*, 589 F.2d at 1188. The Second Circuit suggested instead that "a request for new information ... should not restart the 91-day period, but should merely toll the running of that period until the information is supplied by the applicant," but avoided making a firm commitment to this "tolling" theory over the Seventh and Ninth Circuits' "retriggering" theory. *Id.* at 1189. Given the circumstances of this case, we need not choose between these theories, and we express no views as to which is preferable.[21]

### B. The Comment Period That Follows Federal Register Publication

One possible divergence among our sister circuits is, however, relevant to the case at bar. As discussed above in part I–B of this opinion, the Board has promulgated regulations that require the publication of notice in the *Federal Register* of each application under sections 3(a) or 4(c)(8) of the Act; the regulations indirectly contemplate, and the Board in practice uniformly drafts each notice so as to provide for, a period following publication of the notice during which the public may submit written comments or requests for a hearing on each application. What role does this comment period play in defining the "complete record" for purposes of the 91-day rules of sections 3(b) and 4(c) of the Act? The Second Circuit is the only

---

**20.** We amplify upon this holding below in parts III–B and III–C of this opinion.

**21.** We emphasize that we advance no views whatsoever as to whether either an unsolicited submission or a new submission made in response to a Board request would retrigger or toll the running of the 91-day period, assuming such submission was both necessary and non-cumulative. It may well be that different rules might apply depending on the nature of the submission: for example, it could be argued that the 91-day period should be tolled in the case of a Board request, retriggered in the case of an unsolicited submission by an applicant, and not affected at all by an untimely, unsolicited submission from some other party. We leave to another day the resolution of this complex issue.

court squarely to have addressed this question.

In the *Citicorp* decision cited above, the Second Circuit declined to find that the petitioner's section 4(c)(8) application had been granted by operation of law pursuant to section 4(c)'s 91-day rule. The court could have based this result solely upon its holding that the 91-day period contemplated by section 4(c) did not include the "cleaning up" process that occurs prior to formal acceptance of the application by the Reserve Bank and its transmission to the Board. Although the Second Circuit characterized this holding as a "tempting" stopping point since it adequately disposed of the case before it, the court continued in the interests of "sound judicial administration" to consider an alternative theory urged by the Board. 589 F.2d at 1187. In what could be characterized either as an alternate holding or as dicta, the court held that "ordinarily the 91-day period does not begin until at least [the] expiration of the period for comments upon an application." *Id.* (footnote omitted).[22]

The court focused on section 4(c)'s requirement that the Board give "due notice and an opportunity for hearing" upon section 4(c)(8) applications. Because of this statutory requirement, the court felt that even if no comments or requests for a hearing were received, "the lack of objection to

the proposal is an important fact for the Board, which is not confirmed until the close of the comment period." *Id.* Since comments or the lack thereof are necessarily a part of the "complete record" under the Second Circuit's analysis of section 4(c), the court also focused on the dilemma that the Board might face if the 91-day period were to begin to run prior to the end of the comment period:

In order to assure the full 91 days for careful deliberation, the Board would have to assume that no comments would be received and begin intensive deliberation during the comment period. Then if there were comments that altered the focus of inquiry or changed the information available to the Board, the initial deliberations might become useless. We do not think Congress intended to force the Board either to waste time in possibly premature deliberations or to sacrifice part of its 91 days for decision-making.

*Id.* The court noted that there might be some conflict between its holding and that of the Seventh Circuit cases. *Id.* at 1187 n. 9. The Seventh Circuit, however, has never explicitly addressed the argument that the 91-day period cannot begin until the expiration of the comment period; while in *North Lawndale* the comment period must have extended beyond the date upon which the court held the 91-day period to have com-

---

**22.** We do not read *Citicorp* as holding that the 91-day period *always* begins to run upon the expiration of the comment period, but instead as holding that the 91-day period cannot begin to run *before* the expiration of the comment period. In the words of one commentator:

The expiration date for public comment on an application does not mark the date of submission to the Board of a complete record. Often the record is supplemented thereafter by views of a State banking department or other supervisory authority, by additional information forwarded by the applicant (whether or not requested by the Board or its staff), by opponents to the application, or by a relevant court action.

P. Heller, Handbook of Federal Bank Holding Company Law 326 (1976) (footnote omitted). The Board apparently concurs in this view, according to a 1974 opinion letter:

The [91-day rule] clearly is keyed to and relates to the date on which a *complete rec-*

*ord* is forwarded to the Board. On April 9, 1973, the opportunity for public comment on FG's acquisition of Bank ended. However, the record upon which the Board would base its ultimate judgment was not complete on that date. It was supplemented by receipt of *the written views of the U.S. Comptroller of the Currency* and again by staff reports and recommendations as required by the Board.... To conclude that the 91-day statutory period becomes operative at a date prior to the submission of all essential relevant information, as determined by the Board, would be to permit a bank holding company to nullify the prior approval requirements of the Act by its own inaction. Letter dated Feb. 27, 1974, from the Board of Governors of the Federal Reserve System to Counsel for Financial General Bankshares, Inc., *reprinted at* [1973–1978 Transfer Binder] Fed. Banking L.Rep. (CCH) ¶ 96197, at 81257 (1974) (emphasis in original).

menced, apparently the Board did not argue that point before the Seventh Circuit.[23]

The Second Circuit recognized that the chief argument against its holding was that "the purpose of the statute could be undercut if the local Reserve Bank unduly delays in forwarding an application to the Board, or if the Board delays in publishing notice, or allows an unreasonably long period for comments." 589 F.2d at 1187. The court accepted the proposition that "the Board's discretion to determine the start of the 91-day time period is limited by the implicit statutory requirement that these activities be accomplished with reasonable promptness," *id.* at 1188, and accordingly held that "any undue delay at the Reserve Bank should be subtracted from the 91 days allotted to the Board." *Id.* But the court was satisfied that the Board's unpublished regulations, which required publication of notice within two weeks of receipt of an application and a comment period of 30 days, were "objective guidelines [that] adequately curtail[ed] the potential for Board control or manipulation of the time limit." *Id.* Significantly, in calculating the running of the 91-day period, the court held the Board to its internal guidelines, subtracting from the

comment period an amount of time equal to the Board's delay beyond its internal deadline for securing *Federal Register* publication. *Id.* at 1189.

In the case at bar, the Board argues that we should follow the Second Circuit's *Citicorp* decision; since the close of the comment period in this case was less than 91 days prior to the Board's decision on Republic's application, that application could not, under *Citicorp*, be deemed to have been granted by operation of law. Republic argues both that *Citicorp* is distinguishable and that *Citicorp* is unsound precedent that we should not follow. We disagree with both of Republic's arguments.

Most courts have assumed or stated in dicta that the 91-day rules under section 3(b) and section 4(c) are interchangeable.[24] Republic argues, in effect, that they are not. It is true that there are some differences between section 3(b) and section 4(c). The *Citicorp* court relied in large measure upon section 4(c)'s "due notice and opportunity for hearing" requirement, but there is no such requirement in the language of section 3(b). In fact, our sister circuits have uniformly recognized the different hearing requirements for the two sections.[25]

---

**23.** The *North Lawndale* court indicated that the *Federal Register* notice was published on January 26, 1976. 553 F.2d at 26. The court held, however, that the 91-day period had begun running on January 30, 1976, when the Board received the last submission from an outside source in response to a Board inquiry. *Id.* at 27. Although the court did not indicate the length of the comment period set out in the *Federal Register* notice, it seems likely that it extended beyond January 30, 1976. The *North Lawndale* court did note, however, that "[n]o adverse comments ensued" from the published notice. *Id.* at 26. Although other Seventh Circuit cases mention that notice had been published in the *Federal Register*, none of them attach particular significance to this fact. *See First Lincolnwood*, 546 F.2d at 720; *Tri-State*, 524 F.2d at 564.

The Fourth Circuit in *NCNB Corp.* pointed out that there may be some inconsistency between *Citicorp* and the Seventh Circuit cases, 599 F.2d at 612, but was not compelled to choose between the two lines of cases, since it was able to base its decision on the ground that the "cleaning up" period was not included in the running of the 91 days.

**24.** *E. g., BankAmerica*, 596 F.2d at 1377–78 n. 2; *Memphis Trust Co. v. Board of Governors of the Federal Reserve System*, 584 F.2d 921, 923 n. 5 (6th Cir. 1978).

**25.** *Compare Connecticut Bankers Association v. Board of Governors of the Federal Reserve System*, 627 F.2d 245, 249–50 (D.C.Cir.1980) (Board must afford full evidentiary hearing to interested parties whenever there is a dispute as to facts material to Board's ultimate decision on whether public benefits of a § 4(c)(8) applicant's proposed activities, although closely related and incidental to banking, are outweighed by potential adverse effects); *Independent Bankers Association of Georgia v. Board of Governors of the Federal Reserve System*, 516 F.2d 1206 (D.C.Cir.1975) (same); and *American Bancorporation, Inc. v. Board of Governors of the Federal Reserve System*, 567 F.2d 1082, 1087 (8th Cir. 1974) (same), *with Farmers & Merchants Bank v. Board of Governors of the Federal Reserve System*, 567 F.2d 1082, 1087 (D.C.Cir.1977) (interested parties have no constitutional or statutory right to a hearing on § 3(a) application; hearing necessary only when Comptroller of the Currency has expressed written disapproval); *Grandview Bank*

And while another part of the 1970 amendments to the Act, 12 U.S.C. § 1850 (1976), affords competitors of both section 3(a) and section 4(c)(8) applicants the right to join as parties in interest in proceedings before the Board, that provision does not require that such parties be notified or that they be given a comment period of any particular length.[26] Finally, as noted above in part I–B of this opinion, section 3(b) does not explicitly mandate the provision of notice to, and an opportunity for comment from, the public at large.

Nonetheless, section 3(c) does mandate that one factor that the Board must consider in determining whether to approve an application under section 3 is whether any anticompetitive effects of the ·proposed acquisition would be "clearly outweighed in the public interest by the probable effect of the transaction in meeting the convenience and needs of the community to be served." 12 U.S.C.A. § 1842(c) (West 1980). Congress could hardly have expected that the Board would weigh the community's convenience and needs without soliciting some sort of input from the public. We agree with the Second Circuit that even if no public comments are received, the lack of objection to the proposal is an important fact for the Board—a fact that cannot be determined until after the close of a public comment period.

■ Accordingly, we hold that for the purposes of section 3(b)'s 91-day rule, the "complete record on [an] application" is not received by the Board until at least the close of the public comment period that follows the publication of notice in the *Federal Register*.

Republic argues that this holding would defeat the purposes of the 91-day rule by allowing the Board to determine the running of the 91-day period by altering either the date upon which the *Federal Register* notice is published or the length of the public comment period. This argument does have considerable persuasive force. Although we join the Seventh Circuit in "choos[ing] to believe that this responsible part of our Government will act in a responsible and good faith manner," *Tri-State*, 524 F.2d at 567, we are concerned over the Board's utter failure to provide clear, public guidelines that explain its policies and practices regarding the publication of the *Federal Register* notice and the subsequent comment period, and we agree with the *Citicorp* court that there must be some sort of check on the Board's discretion in this area.

### C. The Need for a Check on the Board's Discretion

We do not accuse the Board of bad faith by pointing out the mystery, confusion, and self-contradiction inherent in its past and present practices and policy pronouncements in this area—all of which stand in sharp contrast to the clear, detailed newspaper notice and comment requirements that the Board has imposed upon applicants.[27] For example, a 1972 opinion letter from the Board announced the following policy:

> It should be noted that, at a minimum, the complete record on a given application cannot be ready for submission to

*& Trust Co. v. Board of Governors of the Federal Reserve System*, 550 F.2d 415, 421 (8th Cir.), *cert. denied*, 434 U.S. 821, 98 S.Ct. 64, 54 L.Ed.2d 78 (1977) (same); *Bank of Boulder v. Board of Governors of the Federal Reserve System*, 535 F.2d 1221, 1225 (10th Cir. 1976) (same); *Commercial National Bank of Little Rock v. Board of Governors of the Federal Reserve System*, 451 F.2d 86, 90–91 (8th Cir. 1971) (same); *Kirsch v. Board of Governors of the Federal Reserve System*, 353 F.2d 353, 356 (6th Cir. 1965) (same); *Northwest Bancorporation v. Board of Governors of the Federal Reserve System*, 303 F.2d 832, 843 (8th Cir. 1962) (same).

**26.** *See Bank of Commerce v. Board of Governors of the Federal Reserve System*, 513 F.2d 164, 166–67 (10th Cir. 1975) (questioning whether competitors were entitled to notice at all, but holding that under 44 U.S.C. § 1508 (1976), notice published in *Federal Register* was legally sufficient to apprise bank holding company's competitors of its § 3(a) application; even if specific notice were given to competitors, there was no assurance that they would have been entitled to a hearing).

**27.** See note 11 *supra* & accompanying text.

the Board prior to the expiration of any comment period. *Normally, notice of an application is published in the Federal Register within five to seven days following acceptance of the application by a Reserve Bank.* Generally 30 days are allowed for comment from interested persons, from the public, and from Federal and State supervisory authorities. Persons counseling prospective applicants should avoid any suggestion or assurance that the complete record will be before the Board for final action at any time before expiration of the time for submission of comment.[28]

But the Second Circuit's opinion in *Citicorp*, while quoting from this letter, 589 F.2d at 1188 n. 11, indicates "that an internal unpublished Board regulation provides for publication of notice within *two weeks of receipt of an application* and for a comment period of thirty days." *Id.* at 1188 (emphasis added). It is not clear whether the *Citicorp* court meant to refer to receipt of the application by the local Reserve Bank, as contemplated by the Board's 1972 opinion letter, or to receipt of the application by the Board after the "cleaning up" process at the Reserve Bank; in either event, however, there is a discrepancy as to *when* the *Federal Register* notice must be published. And at oral argument in this case, the Board's counsel informed us that internal Board regulations provide "that the notice has to be executed within *one week* of the receipt ... of the application"—presumably meaning receipt *by the Board.*

The Board's actual practices appear to have been equally as inconsistent as its policy statements. For example, the notice in the *North Lawndale* case was published over one month after the Board had received the cleaned up application from the Reserve Bank; the Seventh Circuit noted in passing that this did not comply with the

Board's 1972 opinion letter, but did not attach particular significance to that fact. 553 F.2d at 26 & n. 3. And in *Citicorp*, the Board had failed by some ten days to comply with the internal guidelines it described at oral argument before the Second Circuit. 589 F.2d at 1189.

Perhaps in recognition of the confusion surrounding the 91-day rules generally, the Board gave these directions to all Reserve Banks in late 1975, shortly after the Seventh Circuit's decision in *Tri-State* :

> Bank holding companies in your District should be cautioned about consummating any acquisition in reliance upon their own determination, or the opinion of their counsel that the 91-day period has expired and that their application has therefore been granted by operation of law, and should be urged to consult with the Reserve Bank or with the Board's Legal Division in the event they have any question about the effect of the *Tri-State* decision upon a particular application.[29]

We think that the Board has misapprehended the entire thrust of the 91-day rules. Congress clearly intended that these statutory provisions would set definite, readily ascertainable time limits for the processing of section 3(a) and section 4(c)(8) applications, upon which parties *could* rely. In all likelihood, Congress envisioned that in implementing the 91-day rules of section 3(b) and section 4(c), the Federal Reserve System would provide all parties interested in a particular application with some sort of formal, definite notification that the "complete record on [an] application" had been submitted to the Board and that the Board was taking the application and accompanying record under advisement for a period not to exceed 91 days. Such a ritualistic closing of the record would provide an unambiguous reference point from which the running of the 91-day period could be com-

---

**28.** Letter dated Nov. 14, 1972, from the Board of Governors of the Federal Reserve System to Donald L. Rogers, Executive Director, Association of Registered Bank Holding Companies, *reprinted at* [1973–1976 Transfer Binder] Fed. Banking L.Rep. (CCH) ¶ 95820, at 80752 (1972) (emphasis added).

**29.** Letter dated Dec. 1, 1975, from the Board of Governors of the Federal Reserve System to All Presidents of Federal Reserve Banks, *reprinted at* [1973–1978 Transfer Binder] Fed.Banking L.Rep. (CCH) ¶ 96709, at 81873 (1975).

puted. Were the Board to conclude during its deliberations that additional information was necessary for it to make an informed decision, it could effectively reopen the record to receive that information; such a reopening of the record would, according to our sister circuits, either toll or retrigger the running of the 91-day period (although we do not here decide which).

The Board, however, has not chosen to implement the 91-day rules in this manner, and because the Board rather than the judiciary is charged with implementing the statute, it is not within our province to command the Board to do so. But because the Board has failed to create this or some similarly concrete system, the 91-day rules are not the simple mechanisms intended by Congress to apprise the Board and the parties of the deadline for Board action on any given application in advance of that deadline. Instead, they operate as mystical, almost arbitrary sources of confusion and litigation, often adding to the bureaucratic delay they were designed to remedy. In effect, one cannot know whether the 91-day period has run in any given case until after the fact, if then.

 The cure for this larger problem is not within our means; it must come from Congress or the Board. Yet we are loath to allow the Board the power to frustrate the clear mandate of the statute by placing unlimited discretion in its hands as to when the *Federal Register* notice is published and how long a public comment period is specified therein. Accordingly, we follow the *Citicorp* court's path, and will hold the Board to the internal guidelines described by counsel for the Board at oral argument before this court. We hold that if the Board fails to secure publication of the public notice in the *Federal Register* within one week from its receipt of the completed application from the Reserve Bank, or if the Board sets a public comment period greater than 30 days from the end of that one-week

period, such delay shall not prevent the running of the 91-day period. In effect, any such delays are to come out of the Board's deliberation period. We also follow the *Citicorp* court in holding that any undue delay by the Reserve Bank in forwarding the completed application to the Board after the conclusion of the cleaning up period is to be subtracted from the 91 days allotted to the Board.[30]

We emphasize that we do not intend to carve into stone the internal guidelines described by the Board at oral argument before this court. Were the Board to issue clear, reasonable, and unambiguous regulations, consistent with section 3(b), that set out in more detail the Board's policies with regard to the publication of the *Federal Register* notice and the subsequent public comment period—regulations upon which outside parties *could* rely, and by which the Board considered itself bound—we would certainly defer to those regulations.

 Applying these holdings to the case at bar, we note that Republic's completed application was received by the Board one day after it was formally accepted by the Reserve Bank; Republic participated voluntarily in the cleaning up process, and never demanded that the Reserve Bank formally accept its application on any earlier date. We therefore find no undue delay by the Reserve Bank in forwarding the completed application to the Board. The Board met its internal guidelines by arranging for the publication of the *Federal Register* notice within one week after receipt of the completed application, and the public comment period specified therein did not extend more than 30 days beyond the end of that one-week period. Accordingly, the Board did not receive "the complete record on [Republic's] application" until the close of the public comment period on June 9, 1980. Its August 20 decision on Republic's application was well within 91 days from

---

**30.** For example, a Reserve Bank would be guilty of undue delay were it to withhold transmission of an informationally complete, formally accepted application solely for purposes of preparing its own report and recommendations

for the benefit of the Board. Of course, insofar as the Reserve Banks can prepare such reports and recommendations during the cleaning up period, no such delay need occur.

the date it received the complete record. Accordingly, Republic's application cannot be deemed to have been granted by operation of law under section 3(b)'s 91-day rule.[31]

## IV. THE MERITS OF THE BOARD'S ORDER

### A. *The Standard of Review and the Statutory Prerequisites for Rejecting a Section 3(a) Application*

The second issue in this case—the merits of the Board's order—is controlled by our recent holding in *Mercantile Texas Corp. v. Board of Governors of the Federal Reserve System*, 638 F.2d 1255 (5th Cir. 1981) (vacating and remanding 66 Fed.Res.Bull. 423 (1980)). The *Mercantile* court began, as we do, by stressing the standard by which we review such orders of the Board:

> The Board's findings as to the facts, if supported by substantial evidence, are conclusive. 12 U.S.C. § 1848 .... Like decisions of other administrative agencies, however, the Board's order may be affirmed only on the basis of the findings explicitly made in its opinions.... Its decision cannot be affirmed on the basis of "appellate counsel's *post hoc* rationalizations for the agency action," ... or because the contents of the record support conclusions that the Board has not stated. When, as here, an agency makes only minimal findings, its decision rests on precarious ground.

638 F.2d at 1260.

Section 3(c) of the Act forbids Board approval of any bank holding company acquisition that would foster a monopoly, or "whose effect ... may be substantially to lessen competition" unless the Board shall find "that the anticompetitive effects are clearly outweighed in the public interest by the probable effect of the transaction in meeting the convenience and needs of the community to be served." 12 U.S.C.A. § 1842(c) (West 1980). The *Mercantile*

court rejected the Board's argument that the Board may prohibit a proposed merger between bank holding companies if it finds that the anticompetitive effects of the transaction would thwart the "convenience and needs" of the community even if these effects are insufficient to violate section 3(c)'s antitrust standards, which are largely derived from section 7 of the Clayton Act, 15 U.S.C.A. § 18 (West Supp. 1981): "We hold that the Board may not deny approval to a proposed merger of bank holding companies without finding a violation of the antitrust standards explicitly incorporated into [section 3(c) of the Act]." 638 F.2d at 1263.

■ Although phrased in terms of a merger of bank holding companies, we see no reason why this holding of *Mercantile* should not apply equally to a bank holding company's acquisition of a bank, as in the case at bar. Accordingly, for the reasons stated by the *Mercantile* court, 638 F.2d at 1260–63, we hold that the Board may not deny approval of a bank holding company's section 3(a) application to acquire a bank unless the Board finds that the acquisition would constitute a violation of the antitrust standards explicitly incorporated into section 3(c) of the Act.

In the light of the *Mercantile* decision, the Board has argued that its order in this case contains such a finding. Specifically, the Board argues that its order reflects a finding that Republic's acquisition of CNB would constitute a violation of section 3(c)'s Clayton Act standards by eliminating "probable future competition" (described by the *Mercantile* court as "actual potential competition") between CNB and Republic: the order states that "[a]cquisition of [CNB] by [Republic] would eliminate the probability that these two organizations would come into direct competition in the future and the Board would view this competition as desirable because of the present [concentrated] structure of the [Waco] market."

---

**31.** Given our holding above, we need not pass upon the Board's alternate argument that the 91-day period cannot begin to run prior to the expiration of the period for comment from the

Comptroller of the Currency or the appropriate state banking authority (see notes 3 & 9 *supra* & accompanying text).

**1044**

### B. The Findings Necessary as a Predicate to the Application of the Actual Potential Competition Doctrine

The *Mercantile* court discussed at some length the theory that underlies, and the policy arguments for and against, the actual potential competition doctrine; we need not repeat that discussion here. After weighing these arguments, the court concluded that "the doctrine has logical force and is consonant with the language and policy of the Clayton Act." 638 F.2d at 1265. The court stressed, however, that "[t]he Clayton Act prohibits more than 'certainties'; it also prohibits 'probabilities,' but not 'ephemeral possibilities.'" *Id.* at 1266. Because the Board had made only "minimal findings" in that case, the court could not tell "whether more thorough findings [could] separate probabilities from 'ephemeral possibilities.'" *Id.* Accordingly, the court specifically declined to decide "whether the [actual potential competition] doctrine adequately describes a violation of the Clayton Act standard." *Id.* at 1265.

The court went on to detail the four types of findings that were necessary before it could evaluate the viability of this controversial antitrust theory: (1) whether the relevant market is performing oligopolistically, with "the dominant participants in the target market engaging in interdependent or parallel behavior and with the capacity effectively to determine price and total output of goods or services";[32] (2) whether there was a sufficient number of other likely potential entrants into the market so as to vitiate the applicant's importance as a potential competitor; (3) whether there was a reasonable probability that the applicant would, in fact, enter the market independently, based on the anticipated profitability of independent entry, the anticipated profitability of other investment opportunities available to the applicant, and evidence specific to the applicant demonstrating why it might prefer independent entry; and (4) whether independent entry would result in a substantial likelihood of ultimately producing deconcentration of that market or other significant procompetitive effects. *Id.* at 1266–72. Rather than assuming *arguendo* that properly supported findings on these issues would state a Clayton Act violation and reversing the Board's order as not being based on substantial evidence, the court remanded "for a more thorough analysis of the relevant economic data" on the last three of these issues, *id.* at 1270, because the court believed that "further proceedings [would] better insure that the proper disposition is reached," *id.* at 1272.

■ We follow the same path. The Board's opinion in the case at bar contains an inadequate finding on the last three of the four issues identified by the *Mercantile* court as crucial. We discuss all four issues in sequence.

*1. The oligopolistic character of the Waco banking market.*—With respect to the first necessary finding—that the relevant market is performing oligopolistically—there is no meaningful distinction between

---

32. *United States v. Marine Bancorporation, Inc.*, 418 U.S. 602, 630, 94 S.Ct. 2856, 2874, 41 L.Ed.2d 978 (1974). The *Marine Bancorporation* Court, the *Mercantile* court, and the Board have from time to time referred to this issue as being simply a question of market concentration, rather than oligopolistic market performance. This mode of reference may be convenient, but it is also somewhat misleading. In theory, a market in which there are only two competitors—*i. e.*, a market with a two-firm concentration ratio of 100%—may be fiercely competitive. By the same token, a market with fifteen competitors, each of whom account for an equal portion of the market, may behave oligopolistically. As one district court has noted,

> [t]here is no automatic, direct relationship between a particular concentration ratio and the competitive performance in any particular banking market; concentration ratios based on commercial bank deposits are useful only as a starting point of analysis. From this initial analysis, one must thereafter study actual performance of market participants to determine the competitiveness of the market.

*United States v. First National State Bancorporation*, 499 F.Supp. 793, 805 (D.N.J.1980) (footnotes omitted). Accordingly, for purposes of this opinion we will eschew the shorthand description of an oligopolistic market as being simply a "concentrated" market.

the Board opinion and underlying record in this case and those in the *Mercantile* case. The relevant markets were defined identically, with the Waco standard metropolitan statistical area (SMSA) defined as the geographic market and commercial banking defined as the product market.[33] In *Mercantile*, the four-firm concentration ratio for the Waco banking market, measured by commercial bank deposits,[34] was 73.8%; in the case at bar, the four-firm concentration ratio (measured at a slightly different time) was 72.4%. Concentration ratios of this magnitude[35] establish here, as in *Mercan-*

**33.** We recognize that there is a pronounced air of fantasy inherent in any attempt to define "a market" for purposes of measuring anticompetitive effects of an acquisition. Traditional market share analysis is premised on defining the set of firms who compete actively with one another in an attempt to sell goods or services. That analysis, however, fails totally to take notice of certain indisputable economic realities. If the "relevant market" is defined solely by reference to the type of products or services offered by, and the geographic location of, a particular set of firms, the defined "market" will inevitably exclude certain firms who, for at least for some potential customers, are real competitors of the firms included in the defined market.

Consider, for example, the choices offered to a small family living in Waco that wishes to accumulate a "nest egg" for retirement. For such a potential consumer of investment services, to whom security and ease of access may be the most important considerations, *local* commercial banks, savings and loan associations, and credit unions may all be real competitors of one another; but commercial banks, savings and loan associations, and credit unions that are located in Dallas or New York may not be competing for this family's business. Therefore, if one defines the relevant product market to include only commercial banks, one ignores the fact that the defined product market does not truly represent the competitive choices available to *this* consumer of goods and services, even if the geographic limitation does make sense as to this consumer.

By contrast, savings and loan associations and credit unions may not be in legitimate competition for the patronage of a small, strictly local business that seeks a short-term loan to cover inventory additions; with respect to this consumer, a market defined to comprise only Waco commercial banks may be eminently sensible. But with respect to the business of a larger consumer—*e. g.,* a Waco branch of a state-wide, multistate, or multinational corporation—it may be that commercial banks in Dallas, New York, or even Zurich are real competitors. For this consumer, then, the defined product market would make sense, but the defined geographic market would be senseless. *See generally* Markovits, *Monopolistic Competition, Second Best, and the Antitrust Paradox,* 77 Mich.L.Rev. 567, 609–13 (1979); Markovits, *Predicting the Competitive Impact of Horizontal Mergers in a Monopolistically Competitive*

*World: A Non-Market-Oriented Proposal and Critique of the Market Definition-Market Share-Market Concentration Approach,* 56 Texas L.Rev. 587, 593–603 (1978).

For all its flaws, however, market share analysis is firmly entrenched in American antitrust law, and indeed, in bank merger law. See note 37 *infra.* Alternative modes of analyzing the legality of mergers under § 7 of the Clayton Act, such as those proposed by Professor Markovits and others, may have considerable merit, and may not be altogether foreclosed by existing precedent; yet we cannot pass upon such alternate theories in the abstract. The record in the case at bar apparently was developed wholly for purposes of traditional market share analysis; accordingly, this is a poor case in which to blaze new trails of antitrust theory, and we decline to do so.

**34.** Commercial bank deposits can, at best, measure but one aspect of the competition between commercial banks. See notes 32 & 33 *supra.* Nonetheless, the use of commercial bank deposit ratios in establishing a prima facie case that a commercial banking market is performing oligopolistically has been sanctioned by the Supreme Court in the *Marine Bancorporation* case.

**35.** Republic argues that the four-firm concentration ratio of 72.4% is of insufficient magnitude to support a prima facie case of oligopolistic behavior, citing *Marine Bancorporation,* 418 U.S. at 631, 94 S.Ct. at 2874 (three-firm ratio of 92.3%); *United States v. First National State Bancorporation,* 499 F.Supp. 793, 804 (D.N.J. 1980) (four-firm concentration ratios of 87.7% and 86.4%); and *United States v. First National Bancorporation, Inc.,* 329 F.Supp. 1003, 1008 (D.Colo.1971) (three-firm ratio of over 90%), aff'd per curiam by an equally divided court, 410 U.S. 577, 93 S.Ct. 1434, 35 L.Ed.2d 507 (1973). The *Mercantile* court, however, found a four-firm concentration ratio of 73.8% in the Waco market to be sufficient to establish a prima facie case of oligopolistic market performance, relying on 5 P. Areeda & D. Turner, Antitrust Law ¶ 1119 (1980) (recommending 65% minimum four-firm concentration ratio when the eight largest firms control at least 90% of the market). We, of course, are not free to reconsider or overrule a prior decision of a panel of this court. *E. g., In re Corrugated Container Antitrust Litigation,* 647 F.2d 460, 461 (5th Cir. 1981); *Ellis v. Great Southwestern*

*tile*, a prima facie case that the Waco bank market is a candidate for the potential competition doctrine, and shift to Republic the burden to show that the concentration ratios (which may be unreliable indicators of actual market behavior) do not accurately depict the economic characteristics of the Waco market. See *Mercantile*, 638 F.2d at 1267; see also *United States v. Marine Bancorporation, Inc.*, 418 U.S. 602, 631, 94 S.Ct. 2856, 2874, 41 L.Ed.2d 978 (1974).

The *Mercantile* court found that Mercantile Texas Corp. had failed in its attempt to establish a "clear trend to deconcentration"; [36] accordingly, in the light of the prima facie case of oligopolistic behavior made out by the concentration ratios and the failure of the bank holding company adequately to rebut that prima facie case, the court concluded that there was substantial evidence to support the Board's finding that the Waco market was performing oligopolistically. 638 F.2d at 1267.

In the case at bar, Republic argues that evidence of competition from thrift institutions in the Waco SMSA adequately rebuts the prima facie case established by the commercial bank deposit concentration ratios. The Board rejected this argument, concluding that while "thrift institutions hold substantial deposits in the Waco banking market, the Board in this instance is unable to conclude from the evidence in the record

that these institutions compete actively with commercial banks over a sufficient range of financial services to mitigate significantly the anticompetitive effects of [Republic's proposed acquisition of CNB]." In effect the Board thereby refused to redefine the relevant product market to include the thrift institutions, which in turn would have altered the concentration ratios sufficiently to cast doubt upon their significance as an indicator of oligopolistic behavior.[37]

We believe that this refusal was based on substantial evidence. Republic did little more than to point to the amount of the commercial deposits held by such thrift institutions. While the *Marine Bancorporation* Court recognized that deposit concentration ratios may establish a prima facie case that an entire market is performing oligopolistically, such ratios reflect only one component of the entire field of competition across a wide range of financial services; they do not by themselves establish that the overall competition from the thrift institutions was sufficient to render improper their exclusion from the defined product market.

Accordingly, Republic cannot be said to have rebutted the prima facie showing that the Waco banking market is performing oligopolistically for purposes of the potential competition doctrine. We affirm the Board's finding on this first key issue.[38]

---

*Corp.*, 646 F.2d 1099, 1109 (5th Cir. 1981); *Branch v. Phillips Petroleum Co.*, 638 F.2d 873, 877 (5th Cir. 1981). We do not read *Mercantile* as carving into stone the recommendations of Professors Areeda and Turner on this point; wherever the line is ultimately to be drawn, however, we feel sure that it will not be between 73.8% and 72.4%.

**36.** Republic makes the same argument here. As in *Mercantile*, however, the evidence shows that the Waco banking market is deconcentrat *ing* but does not show that it is deconcentrat*ed*; neither does it display the "clear trend to deconcentration" required by the *Mercantile* court.

**37.** Of course, numerous Supreme Court opinions in addition to *Marine Bancorporation* have treated the cluster of products and services that commercial banks offer as a unique and distinct line of commerce for Clayton Act purposes. *E. g., United States v. Connecticut Nat'l*

*Bank*, 418 U.S. 656, 663, 94 S.Ct. 2788, 2793, 41 L.Ed.2d 1016 (1974); *United States v. Phillipsburg Nat'l Bank & Trust Co.*, 399 U.S. 350, 359–60, 90 S.Ct. 2035, 2041–42, 26 L.Ed.2d 658 (1970); *United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 355–57, 83 S.Ct. 1715, 1737–38, 10 L.Ed.2d 915 (1963).

**38.** Republic also directs us to the *Marine Bancorporation* Court's recognition that due to the nature of this highly regulated industry, "*all* banking markets in the country are likely to be concentrated." 418 U.S. at 632, 94 S.Ct. at 2875 (emphasis in original). The *Marine Bancorporation* Court also pointed out, however, that "the same factor that usually renders such markets concentrated and theoretical prospects for potential-competition § 7 cases—regulatory barriers to new entry—will also make it difficult to establish that the doctrine invalidates a particular geographic market extension merger." *Id.*

2. *Other potential entrants.*—The *Mercantile* court stressed that "[i]f there are numerous other potential competitors waiting in the wings, elimination of the [applicant bank holding company] as one potential entrant would not be significant." 638 F.2d at 1267. Consequently, the court held that as a predicate for any application of the actual potential competition theory, the Board must make explicit findings in which it identifies the other potential entrants into the target market and evaluates "whether the number of other potential entrants and the likelihood of their potential entry vitiate [the applicant's] importance as a potential competitor." *Id.* at 1268.

In the case at bar, the Board made no such findings. It argues on appeal that "the record reflects agreement as to the limited number of [potential] entrants"—an argument that Republic sharply disputes—and suggests that in these circumstances, "the need for an explicit evaluation by the Board does not appear to be compelling." This suggestion simply flies in the face of the *Mercantile* court's emphasis on the standard for reviewing Board decisions: the Board's decision *cannot* be affirmed merely because the contents of the record support conclusions that the Board has not stated. *Id.* at 1260. As in *Mercantile*, the Board has made no reviewable finding on this issue.

3. *The reasonable probability of independent entry.*—The Board did find that "in view of [Republic's] overall size, financial and managerial resources and history of, and plans for, expansion, [Republic] appears to be a likely entrant into the [Waco] market in the reasonably foreseeable future." But the Board failed to satisfy the *Mercantile* court's requirement, 638 F.2d at 1269, that it offer a persuasive rationale demonstrating that Republic would prefer the opportunity to enter Waco over other opportunities for expansion or investment. Specifically, the Board did not consider the anticipated profitability of independent entry in Waco; neither did it evaluate the profitability of other opportunities for investment or expansion available to Republic elsewhere. Accordingly, the Board has

made no reviewable finding on the likelihood of independent entry.

4. *Significant procompetitive effects from independent entry.*—Finally, the Board failed to make a reviewable finding on whether Republic's independent entry into the Waco banking market would result in a substantial likelihood of ultimately producing deconcentration of that market or other significant procompetitive effects. The Board made no explicit finding that independent entry by Republic "would result in 'a substantial likelihood of ultimately producing deconcentration of that market or other significant procompetitive effects.'" *Mercantile*, 638 F.2d at 1270 (quoting *Marine Bancorporation*, 418 U.S. at 633, 94 S.Ct. at 2875). As in *Mercantile*, the preservation of competition between the applicant and the bank to be acquired would be a procompetitive effect, but the Board's findings "fail to explain the significance of that finding." 638 F.2d at 1270. The Board's findings also fail to assess the significance of Republic's potential competition with banking institutions other than CNB that are already in the Waco market.

Similarly, the Board's prediction that Republic is a likely candidate for independent entry in the "reasonably foreseeable future" falls well short of the *Mercantile* court's requirement that the Board determine "at what point [the applicant] would be likely to enter the market." *Id.* at 1272. A more definite finding—perhaps specifying a range of months or years within which such entry would likely occur—is necessary in order for the Board to predict with any degree of accuracy whether the target market will still be performing oligopolistically at the time of entry, which in turn is a necessary finding en route to the ultimate conclusion that independent entry would result in a substantial likelihood of significant procompetitive effects.

### C. Conclusion

The Board's failure to make sufficient findings with respect to three of the four issues that were listed as crucial by the

**1048**

*Mercantile* court means that, given the standard of review set forth above in part IV–*A* of this opinion, we cannot affirm the Board's order. However, because the Board's decision in this case was made without benefit of the *Mercantile* court's analysis, we decline to reverse the Board's order as not being based on substantial evidence; instead, we vacate that order and remand for reconsideration and more thorough findings in the light of that case and of this opinion.[39] As did the *Mercantile* court, we decline to decide in the absence of such findings whether the actual potential competition doctrine adequately describes a violation of the Clayton Act standard incorporated into section 3 of the Bank Holding Company Act.

VACATED and REMANDED.

---

**39.** In one sentence, without any further discussion or analysis, the Board also found that "[c]onsummation of [Republic's] proposal would also eliminate the present procompetitive effect [Republic] exerts as a result of its position as a perceived potential entrant into the market." Arguably, this constitutes a finding that Republic's proposed acquisition of CNB would violate § 7 of the Clayton Act under the "perceived potential competition" theory, which was discussed briefly by the *Mercantile* court, 638 F.2d at 1264, but not relied upon by the Board in that case. The Board's conclusory statement, however, is unquestionably an insufficient basis for meaningful judicial review.

The perceived potential competition branch of the potential competition doctrine was accepted by the Supreme Court in *United States v. Falstaff Brewing Corp.*, 410 U.S. 526, 93 S.Ct. 1096, 35 L.Ed.2d 475 (1973), but its application to the banking industry was sharply qualified by the Supreme Court's later opinion in *Marine Bancorporation.* The *Marine Bancorporation* Court recognized that in *Falstaff,* "the Court ha[d] interpreted § 7 as encompassing what is commonly known as the 'wings effect'—the probability that the acquiring firm prompted premerger procompetitive effects within the target market by being perceived by the existing firms in that market as likely to enter *de novo.*" 418 U.S. at 625, 94 S.Ct. at 2871. But the Court emphasized that "the application of the doctrine to commercial banking must take into account the unique federal and state regulatory restraints on entry into that line of commerce." 418 U.S. at 627, 94 S.Ct. at 2872.

The perceived potential competition doctrine and the actual potential competition doctrine share some elements. Neither theory can apply to nonoligopolistic markets. The commercial bank deposit ratios of the Waco market established a prima facie case that the Waco banking market is performing oligopolistically, and Republic failed to rebut that prima facie case; see the discussion above in part IV–*B*–1 of this opinion. This finding, which we have determined is supported by substantial evidence, is adequate for both theories. Similarly, both the perceived potential competition theory and the actual potential competition theory require a finding as to other potential entrants who may be "waiting in the wings." *See Falstaff,* 410 U.S. at 534 n.13, 93 S.Ct. at 1101 n.13; *FTC v. Procter & Gamble Co.*, 386 U.S. 568, 581, 87 S.Ct. 1224, 1231, 18 L.Ed.2d 303 (1967). For purposes of the perceived potential competition theory, the Board's finding on such other potential entrants is inadequate for precisely the same reasons expressed above in part IV–*B*–2 of this opinion.

In addition to these two elements, the perceived potential competition theory can be applied only if "the acquiring firm has the characteristics, capabilities, and economic incentive to render it a perceived potential *de novo* entrant, and if the acquiring firm's premerger presence on the fringe of the market in fact tempered oligopolistic behavior on the part of existing participants in that market." *Marine Bancorporation,* 418 U.S. at 624–25, 94 S.Ct. at 2871–72. While the Board's findings are arguably adequate as to Republic's ability and incentive to enter the Waco market independently, and are arguably supported by substantial evidence on that point, the Board's order fails completely to consider how Republic was perceived by banks in Waco, and—more important—how that perception might have tempered their oligopolistic behavior.

Accordingly, the perceived potential competition theory cannot serve as a basis for affirming the Board's order in this case. As with the actual potential competition theory discussed above in text, we will give the Board the opportunity to reconsider and to make more thorough findings on the perceived potential competition theory on remand.